2002 UT 66

**STATE of Utah, Plaintiff and Appellee,**

**v.**

**Ferosa BLUFF, Defendant and Appellant.**

**No. 990808.**

Supreme Court of Utah.

July 19, 2002.

Mark L. Shurtleff, Att'y Gen., Karen Kluc-znik, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Edward K. Brass, Salt Lake City, for defendant.

## INTRODUCTION

DURHAM, Chief Justice:

¶ 1 Ferosa Bluff ("Bluff") appeals her conviction of first degree felony murder under Utah Code section 76–5–203, second degree

felony child abuse under Utah Code section 76-5-109, and second degree felony sexual abuse of a child under Utah Code section 76-5-404.1 in connection with the death of her three-year-old child.

## BACKGROUND

¶ 2 "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Daniels*, 2002 UT 2, ¶ 2, 40 P.3d 611.

¶ 3 On October 21, 1998, Rebecca Bluff, three years, ten months old, was pronounced dead at Primary Children's Hospital. Her death was caused by blunt force trauma injuries sustained while in the care of her mother, Bluff.

¶ 4 Approximately two weeks prior to October 21, 1998, Bluff, accompanied by her two daughters, Rebecca and Sarah, left her home in Canada to live with Andrew ("Andrew") and Suzanna Fedorowicz ("Suzanna") in Utah. Before her arrival in Utah, Rebecca had been a normal, healthy child with no known health problems. On October 21, 1998 at about 3:00 p.m., two weeks after Rebecca's arrival in Utah, an emergency dispatcher received a 911 call describing a child in full cardiac arrest at the Fedorowiczs' residence, purportedly from falling down the stairs the preceding day. The paramedics and fire department responded to the call and found Rebecca lying naked and wet on the bathroom floor, where Bluff and Andrew had been performing CPR on her lifeless body. Bluff and Andrew stated they had placed Rebecca in a tub of cold water to revive her after she fainted. The paramedics and other emergency personnel observed that Rebecca was in a severe state of hypothermia, not breathing, and lacked a pulse; also, her pupils were fixed, dilated, and glazed, indicating her death before their arrival. Neither the paramedics nor the other emergency personnel were able to revive Rebecca, and she was officially pronounced dead at Primary Children's Hospital at 3:58 p.m.

¶ 5 The autopsy showed that, prior to her death, Rebecca suffered severe internal and external bruising and bleeding, including serious bruises on her arms, legs, feet, and face. An especially severe bruise—a large solid purple bruise—extended from the bottom of her buttocks to the bottom of her shoulder blades. Rebecca also had a "very bright purple bruise around her genitals." In addition to the external bruising, Rebecca suffered severe internal injuries and internal hemorrhaging leaving "virtually no blood left in [her circulatory system]."

¶ 6 After Rebecca was pronounced dead at the hospital, Dr. Howard Kadish, a doctor specializing in pediatric emergency medicine, performed a full examination of Rebecca's body. He testified at trial that the linear marks on Rebecca's buttocks were consistent with injuries inflicted with a belt, rod, hand, or other similar linear tool. Bruises on Rebecca's legs were consistent with being repeatedly hit or beaten with a long object. He further testified that Rebecca's bruises were not likely from a fall, but were the result of non-accidental trauma, as the pattern injuries [1] on Rebecca's body were inconsistent with a fall down the stairs.

¶ 7 Dr. Timothy J. Kutz, a pediatrician specializing in child abuse and neglect, testified that Rebecca may have fallen down some stairs, but that the injuries that killed her were intentionally inflicted, not accidental. He also testified that he had never seen bruising on a child as extensive as Rebecca's bruising.

¶ 8 Dr. Maureen Frikke, a forensic pathologist, performed an autopsy on Rebecca's body. Dr. Frikke testified that Rebecca suffered extensive pattern and non-pattern bruising. Dr. Frikke stated that, in her opinion, not all of the bruises were inflicted at once, but were inflicted over a short period of time. Dr. Frikke testified that Rebecca had pattern bruises on her right arm, cheek, and legs, consistent with grasping and pinching; a "wrap-around" bruise on her left arm; numerous linear bruises that wrapped

---

1. Dr. Frikke testified that "pattern injury" is a term that describes an injury that is thought to resemble the surface characteristics or shape of the object that caused the injury. The terms "pattern injury" and "pattern bruising" are used interchangeably throughout this opinion.

around from her left hip to the front of her thigh and then to the back of her thigh; and linear bruises that wrapped around her left leg near her knee. Rebecca also had four lacerations on the back of her head that appeared to have been inflicted by a knife-like instrument. None of the cuts showed signs of healing.

¶ 9 Dr. Frikke further testified that leather straps with buckles and D-rings found in the Fedorowiczs' apartment would have inflicted injuries consistent with the pattern injuries on Rebecca's arms. The linear wrap-around injuries on Rebecca's legs were consistent with being struck by looped cords or looped rope. Rebecca had pattern injuries on both of her lower calves that were consistent with being bound or restrained by ropes, cords, or the same D-ring leather straps that could have caused the pattern injuries to Rebecca's arms. Bruises on the bottoms of Rebecca's feet were consistent with being beaten with a stick or a rod. Dr. Frikke testified that Rebecca's lower back and buttocks had extensive parallel pattern injuries and abrasions that were consistent with being struck by cords or a whip. In addition to the external pattern and non-pattern injuries, Dr. Frikke also explained that Rebecca suffered trauma injuries to her genitalia, causing hemorrhaging. According to Dr. Frikke, Rebecca also experienced interior irritation and swelling to the left side of the vagina.

¶ 10 Dr. Frikke opined that Rebecca would have manifested her pain and discomfort from her multiple injuries and bruising through crying or, at a minimum, through extreme irritability.

¶ 11 Bluff claimed that Rebecca's injuries were caused exclusively by a fall down the stairs on the day before her death. Bluff stated that she had been with her children "24/7" since they moved in with the Fedorowiczs, and that she had never left the children alone with the Fedorowiczs during her stay. Although Bluff claimed she did not spank or punish her children, Andrew admitted that he had spanked Rebecca on numerous occasions for disciplinary reasons. Bluff asserted, however, that she would have known if anyone had spanked or abused her children.

¶ 12 Bluff further contended that, even though she was the primary caregiver, taking care of all her children's needs, she did not notice any of Rebecca's extensive injuries until she and Andrew undressed Rebecca to place her in a cold bath in an attempt to revive her on the day of her death. Bluff stated that, prior to Rebecca's fainting, Rebecca did not display any signs of injury, discomfort, or other evidence that would have alarmed Bluff or called attention to Rebecca's extensive injuries.

## ISSUES

1. Gruesome Photographs

¶ 13 Bluff submitted a motion in limine to exclude all photographic evidence of the victim. Bluff specifically objected to four color autopsy photographs of Rebecca, State's exhibits one through four. Exhibit one shows Rebecca's bruised lower buttocks and thighs with a metric card lying on one leg. Exhibit two is a photo of Rebecca lying face down on the medical examiner's table showing the extensive bruising on her backside and buttocks. Exhibit three depicts a photo of Rebecca's buttocks showing bruising, abrasions, and scratching. Exhibit four is a photo of the back of Rebecca's head shaven to show the extensive bruising to the back and side of the head. Additionally, this photo shows several lacerations that were previously hidden under the hairline.

¶ 14 At the hearing on the motion in limine to suppress the photographs, the trial judge initially determined that not one of the State's photographic exhibits, including exhibits one through four, was gruesome because the photographs did not unfairly depict Rebecca's injuries or her condition. The trial judge further substantiated his ruling by noting the photographs' lack of blood, body contortions, and facial contortions. The trial judge did acknowledge that State's exhibits two and four could potentially be gruesome, but concluded that the disparate versions of the events leading up to Rebecca's death offered by witnesses created "an unusual probative value for the[ir] admissibility...."

### 2. Videotape Evidence

¶ 15 In the Fedorowiczs' apartment, and in another apartment nearby, which the Fedorowiczs rented, investigating officers found a cat-o'-nine-tails,[2] leather straps that were about two inches wide and ten to twelve inches long with D-rings and buckles, leather straps connected to an O-ring with one strap connecting to a buckle and the other strap having holes for the buckle, another whip with a two-inch handle and six-inch pliable leather strap, and two three-foot-long chains with clasps at the ends. Each of these items was introduced into evidence.

¶ 16 The State sought to introduce into evidence a videotape wherein Bluff, Andrew, and Suzanna engaged in sadomasochistic sexual activities using items similar to the whips and restraints found by the officers. Bluff submitted a motion in limine to suppress the videotape evidence and any photographs of Bluff engaging in consensual sexual activities with other adults. The court initially took the matter under advisement subject to a sufficient evidentiary foundation by the State's expert witnesses, and later denied Bluff's motion to exclude the videotape.

¶ 17 The State did not play the videotape for the jury, but presented a description of its contents through an officer who, after viewing the videotape, testified about two different scenes involving Bluff, Andrew, and Suzanna. The officer testified that the first scene depicted Suzanna nude, lying face down on a bed with her wrists and ankles bound by what appeared to be black leather straps. Bluff and Andrew were striking Suzanna repeatedly on the buttocks and the genital area with whip-like devices, including a device that appeared to be the cat-o'-nine-tails previously admitted into evidence. The second scene showed Suzanna nude, lying face up on the same bed restrained by the same leather straps as the previous scene. A nude Bluff was striking Suzanna in the genital area with a wide leather strap similar to a leather strap previously introduced into evidence. Andrew did not appear in this scene, but his voice could be heard directing the actions of Bluff and Suzanna.

### 3. Jury Instructions and *Shondel* Doctrine

¶ 18 At the close of all the evidence, Bluff moved to dismiss all charges on grounds of insufficient evidence, and alternatively, to reduce the felony murder charge to third-degree child abuse homicide. Bluff also objected to the trial court's jury instructions pertaining to felony murder. The trial judge denied the motions and overruled the objection. Bluff contended that the felony murder and child abuse homicide charges consist of the same elements and that therefore the jury should have been instructed on only the lesser crime, according to *State v. Shondel*, 22 Utah 2d 343, 453 P.2d 146 (1969). Bluff also argued that the jury instructions were erroneous in failing to instruct that a felony murder conviction required a finding of intent to commit the actual murder, not just intent to commit the underlying felony.

### 4. Merger

¶ 19 After the conclusion of the jury trial but before the sentencing hearing, Bluff moved to merge her child abuse conviction into her felony murder conviction and to dismiss her sexual abuse conviction or merge it into the felony murder conviction. Alternatively, Bluff moved to be sentenced concurrently for her convictions. In her merger argument, Bluff contended that the child abuse and sexual abuse of a child convictions should merge into her murder conviction as lesser-included offenses. Bluff argued that, according to the protections provided by the double jeopardy doctrine and Utah Code section 76–1–402, she should not be convicted of multiple offenses based on the same acts. Bluff alternatively argued that if the convictions would not merge, then she should serve concurrent sentences for the convictions. The trial court denied both motions. At the sentencing hearing, the trial judge ordered Bluff to serve consecutive sentences for her convictions of felony murder, child abuse, and sexual abuse of a child.

**2.** A cat-o'-nine-tails is a whip with nine knotted lines or cords fastened to a handle.

## ANALYSIS

¶ 20 On appeal Bluff argues that (1) the trial court erroneously instructed the jury on the intent requirement of felony murder, (2) the elements of felony murder and child abuse homicide are identical, entitling her to be sentenced according to the lesser crime of child abuse homicide, (3) the child abuse and sexual abuse of a child convictions should merge into felony murder as lesser-included offenses, (4) the trial court erred in not excluding photographic evidence of the victim, (5) the trial court erred in allowing evidence of the contents of a videotape showing Bluff engaged in sexual activities with other adults, (6) the trial court erred in not requiring the State to prove she had the ability to "control" Andrew, (7) the evidence was not sufficient to support her convictions, and (8) the trial court erred in sentencing Bluff to consecutive sentences.

## I. JURY INSTRUCTIONS

¶ 21 "Whether the trial court's refusal to give a proposed jury instruction constitutes error is a question of law, which we review for correctness." *State v. Kell*, 2002 UT 19, ¶ 22, —— P.3d ——, 2002 WL 193025, 440 Utah Adv. Rep. 20 (citing *State v. Hamilton*, 827 P.2d 232, 238 (Utah 1992)). A defendant has the right to present his or her theory of the case to the jury and to have the jury instructed accordingly, but the defendant does not have the right to improperly instruct the jury. The trial court may reject the defendant's instruction where the instruction incorrectly states the law or where the instruction is properly covered in other instructions. *See Brewer v. Denver & Rio Grande W. R.R.*, 2001 UT 77, ¶ 38, 31 P.3d 557; *Hamilton*, 827 P.2d at 238.

¶ 22 Bluff claims two errors in the jury instructions: (1) error in the instruction regarding the intent element of felony murder, and (2) error in not instructing the jury that Rebecca must not be a party to the felony that caused her death. First, Bluff argues that the trial court improperly instructed the jury on the elements of felony murder, and thus committed reversible error. Bluff was convicted of felony murder under Utah Code section 76–5–203(1)(d) for causing the death of a person other than a party during the commission of "sexual abuse of a child ... or child abuse, as defined in Subsection 76–5–109(2)(a), when the victim is younger than 14 years of age." Bluff argues that she cannot be convicted of felony murder unless she had the mens rea or actual intent to commit murder. The trial judge concluded that the felony murder statute did not require the mens rea to commit murder, just the mens rea to commit the underlying felony.

¶ 23 In *State v. Honie*, 2002 UT 4, ¶ 25, —— P.3d ——, 438 Utah Adv. Rep. 39, we addressed whether felony murder requires the mens rea to commit murder and concluded that felony murder requires only the mens rea to commit the underlying felony. The defendant in *Honie* similarly argued that section 76–5–203(1)(d) did not require a culpable mental state. As we indicated in *Honie*, however, the statute does require a mental state; that mental state is the mental state required to commit the underlying felony. *Id.* Bluff's argument that felony murder requires the intent to commit murder is thus unavailing in light of *Honie* and our previous interpretations of the felony murder statute. *See also State v. McCovey*, 803 P.2d 1234, 1238 (Utah 1990)(noting that the felony murder statute enhances the offense and punishment without requiring the intent to commit murder, elevating an unintentional killing to second degree murder). The only mens rea element required for felony murder in Bluff's case is the intent to commit child abuse, as defined in section 76–5–109(2)(a), or sexual abuse of a child, as defined in section 76–5–404.1. We conclude that Bluff's proposed instruction on the mens rea element of the felony murder statute inaccurately stated the law, and that the trial court properly declined to instruct the jury in accordance with Bluff's proposed instructions.

¶ 24 Second, Bluff argues that the trial court erred in failing to instruct the jury that, in order to convict, the jury must find that Rebecca was not a party to her own death. Bluff raises this issue for the first time on appeal, relying on the doctrines of

plain error and ineffective assistance of counsel.

¶ 25 A party who fails to raise an issue with the trial court is generally barred from raising that issue for the first time on appeal unless the trial court committed plain error. To demonstrate plain error, the defendant must show that "(i) an error was made, (ii) the error should have been obvious to the trial court, and (iii) the error was harmful, so that in the absence of the error, a more favorable outcome was reasonably likely." *State v. Roth*, 2001 UT 103, ¶ 5, 37 P.3d 1099 (citing *State v. Helmick*, 2000 UT 70, ¶ 9, 9 P.3d 164).

> The plain error rule permits the appellate court to assure that justice is done, even if counsel fails to act to bring a harmfully erroneous ruling to the attention of the trial court. But if a party through counsel has made a conscious decision to refrain from objecting or has led the trial court into error, we will then decline to save that party from the error.

*State v. Bullock*, 791 P.2d 155, 158 (Utah 1989).

¶ 26 We recognize the necessity of properly instructing the jury regarding all elements required for a crime. "The jury must be instructed with respect to all the legal elements that it must find to convict of the crime charged, and the absence of such an instruction is reversible error as a matter of law." *State v. Jones*, 823 P.2d 1059, 1061 (Utah 1991). " 'The general rule is that an accurate instruction upon the basic elements of an offense is essential. Failure to so instruct constitutes reversible error.' " *Id.* (quoting *State v. Roberts*, 711 P.2d 235, 239 (Utah 1985)). "Thus, the failure to give this instruction can never be harmless error." *Id.*

¶ 27 Bluff, however, misunderstands the purpose behind the "other than a party" language in section 76–5–203(1)(d). We have previously noted that the purpose of that language is "consistent with the principle that a felon should not be held liable for the unintended death of a co-felon who willingly participated in the criminal venture." *State v. Hansen*, 734 P.2d 421, 427 (Utah 1986).

The statute has no bearing on Rebecca's death; as a victim, she could not be a "party" to her own abuse.

¶ 28 In our review of the record and the briefs, we cannot find a single instance where Bluff seriously contends that Rebecca was a "party" to the felony that resulted in her death. To argue that Rebecca was a "party" to her own felony abuse would have been, at best, a tactical nightmare, and, at worst, would have swayed the jury entirely against Bluff. Thus, it was not clear error and, given the facts of this case, we do not see how the possibility of error could have been obvious to the trial court. We conclude that the trial court did not err in failing to give the instruction on its own motion.

¶ 29 To establish an ineffective assistance of counsel claim, "a defendant first must demonstrate that counsel's performance was deficient, in that it fell below an objective standard of reasonable professional judgement. Second, the defendant must show that counsel's deficient performance was prejudicial—i.e., that it affected the outcome of the case." *State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92 (citing *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

¶ 30 Bluff relies on ineffective assistance of counsel in addition to plain error for the argument that the trial court committed reversible error in failing to instruct the jury regarding the "other than a party" element of felony murder. We concluded above that the failure to instruct the jury on the "other than a party" element of felony murder was not error in this case. For the same reasons outlined in our analysis under plain error, we reject Bluff's ineffective assistance of counsel claim.

## II. *SHONDEL* DOCTRINE

¶ 31 A trial court's interpretation of a statutory provision is a legal question, which we review for correctness. *State ex rel. Div. of Forestry, Fire and State Lands v. Tooele County*, 2002 UT 8, ¶ 8, 44 P.3d 680.

¶ 32 Bluff claims that the trial court erred by refusing to reduce Bluff's felony murder conviction to child abuse homicide. Bluff

argues that the elements and evidence required for each offense are identical and that no rational distinction exists between first degree felony murder and third degree child abuse homicide.

¶ 33 In *State v. Shondel*, 22 Utah 2d 343, 453 P.2d 146 (Utah 1969), and its progeny, we have held that where two statutes define exactly the same penal offense, a defendant can be sentenced only under the statute requiring the lesser penalty. *Id.*, 22 Utah 2d. at 346, 453 P.2d at 147–48. The doctrine necessarily applies only when the two statutes address "exactly the same conduct." *State v. Gomez*, 722 P.2d 747, 749 (Utah 1986). We must therefore determine whether the two statutes in question here, Utah Code sections 76–5–203 and 76–5–208, have identical elements and prohibit exactly the same conduct. Section 76–5–203 provides that a person is guilty of felony murder if the person:

(d) while in the commission, attempted commission, or immediate flight from the commission or attempted commission of aggravated robbery, robbery, rape, object rape, forcible sodomy, or aggravated sexual assault, aggravated arson, arson, aggravated burglary, burglary, aggravated kidnapping, kidnapping, child kidnapping, rape of a child, object rape of a child, sodomy upon a child, forcible sexual abuse, sexual abuse of a child, aggravated sexual abuse of a child, *or child abuse, as defined in Subsection 76–5–109(2)(a)*, when the victim is younger than 14 years of age, causes the death of another person other than a party as defined in Section 76–2–202.

Utah Code Ann. § 76–5–203(1)(d) (1999) (emphasis added). Section 76–5–208 defines child abuse homicide as follows:

(1) Criminal homicide constitutes child abuse homicide if the actor causes the death of a person under 18 years of age and the death results from *child abuse, as defined in Subsection 76–5–109(1)*:

(a) if done *recklessly* as provided in Subsection 76–5–109(2)(b);

(b) if done with *criminal negligence* as provided in Subsection 76–5–109(2)(c); or

(c) if done with the *mental culpability as provided in Subsection 76–5–109(3)(a), (b), or (c).*

(2) Child abuse homicide as described in Subsection (1)(a) is a second degree felony.

(3) Child abuse homicide as described in Subsections (1)(b) and (c) is a third degree felony.

Utah Code Ann. § 75–5–208 (2001) (emphasis added).

¶ 34 Bluff argues that subsection 76–5–203(1)(d) and subsections 76–5–208(1)(a) and (b) prohibit exactly the same conduct as subsection 76–5–208(1)(c), and that subsections 203(1)(d) and 76–5–208(1)(a) and (b) comprise the same elements of child abuse as subsection 76–5–208(1)(c). The resolution of this issue is a matter of statutory interpretation.

The primary rule of statutory interpretation is to give effect to the intent of the legislature in light of the purpose the statute was meant to achieve. To discover that intent, we look first to the plain language of the statute. In construing a statute, we assume that each term in the statute was used advisedly; thus the statutory words are read literally, unless such a reading is unreasonably confused or inoperable.

*Harmon City, Inc. v. Nielsen & Senior*, 907 P.2d 1162, 1167 (Utah 1995) (internal quotations omitted).

In analyzing a statute's plain language, we must attempt to give each part of the provision a relevant and independent meaning so as to give effect to all of its terms. However, if we find a provision that causes doubt or uncertainty in its application, we must analyze the act in its entirety and harmonize its provisions in accordance with the legislative intent and purpose. Nevertheless, a statute's unambiguous language may not be interpreted to contradict its plain meaning.

*State v. Burns*, 2000 UT 56, ¶ 25, 4 P.3d 795 (internal quotations omitted).

¶ 35 Bluff's interpretation of section 76–5–208 would render portions of the statute redundant, superfluous, and inoperable, and

therefore is impermissible under the plain language rule. Bluff erroneously argues that the phrase "child abuse" has the same meaning throughout the entire statute. In fact, section 76–5–208 combines two types of child abuse with three different mental states to define different levels of criminal conduct. Close scrutiny of the statute reveals that child abuse has two different, mutually exclusive meanings in section 76–5–208. For purposes of section 76–5–208(1)(c), the various mental states contained in subsections 76–5–109(3)(a), (b), and (c) are combined for purposes of defining "child abuse." Under 76–5–109(3), the term "physical injury"[3] is the relevant category of harm to the victim. Thus, each of the mental states in subsection 76–5–109(3) must occur together with child abuse defined as "physical injury" in order to constitute child abuse homicide. In contrast, the mental states in subsections 76–5–203(1)(d), 76–5–208(1)(a), and 76–5–208(1)(b) must be combined with child abuse involving "serious physical injury," as described in section 76–5–109(2).[4] "Physical injury" and "serious physical injury" are mutually exclusive forms of injury by definition, as set forth in subsections 76–5–109(1)(c) and (d); these two definitions do not overlap. As each form of conduct prohibited by subsections 76–5–203(1)(d) and 76–5–208(1)(a), (b), and (c) result from mutually exclusive combinations of injury and intent, we reject Bluff's argument that section 76–5–208(1)(c) prohibits the identical conduct referred to in subsections 76–5–203(1)(d) and 76–5–208(1)(a) and (b).

¶ 36 Felony murder combines the death of a child with the intent and "serious physical injury" requirements of section 76–5–109(2)(a). Thus, the elements of felony murder (where the underlying felony is child abuse as described in subsection 76–5–109(2)(a)) are (1) the death of the child and (2) intentionally or knowingly inflicting serious physical injury (as defined in 76–5–109) upon the child or causing or intentionally or knowingly permitting another to inflict serious injury upon the child. Child abuse homicide does not replicate the elements of felony murder.[5] We need not address Bluff's constitutional arguments, as we conclude that the statute is sufficiently clear and does not create two different penalties for exactly the same conduct.

---

**3.** Physical injury is defined by section 76–5–109(1)(c):

> "Physical injury" means an injury to or condition of a child which impairs the physical condition of the child, including:
> (i) a bruise or other contusion of the skin;
> (ii) a minor laceration or abrasion;
> (iii) failure to thrive or malnutrition; or
> (iv) any other condition which imperils the child's health or welfare and which is not a serious physical injury as defined in Subsection (1)(d).

**4.** Serious physical injury is defined by section 76–5–109(1)(d):

> "Serious physical injury" means any physical injury or set of injuries which seriously impairs the child's health, or which involves physical torture or causes serious emotional harm to the child, or which involves a substantial risk of death to the child, including:
> (i) fracture of any bone or bones;
> (ii) intracranial bleeding, swelling or contusion of the brain, whether caused by blows, shaking, or causing the child's head to impact with an object or surface;
> (iii) any burn, including burns inflicted by hot water, or those caused by placing a hot object upon the skin or body of the child;
> (iv) any injury caused by use of a dangerous weapon as defined in Section 76–1–601;

> (v) any combination of two or more physical injuries inflicted by the same person, either at the same time or on different occasions;
> (vi) any damage to internal organs of the body;
> (vii) any conduct toward a child which results in severe emotional harm, severe developmental delay or retardation, or severe impairment of the child's ability to function;
> (viii) any injury which creates a permanent disfigurement or protracted loss or impairment of the function of a bodily member, limb, or organ;
> (ix) any conduct which causes a child to cease breathing, even if resuscitation is successful following the conduct; or
> (x) any conduct which results in starvation or failure to thrive or malnutrition that jeopardizes the child's life.

**5.** There is an apparent anomaly in the statute, however. Section 76–5–208(c) specifies penalties for causing death through three different mental states (intentional or knowing, reckless, and criminal negligence) separately combined with "physical injury." Given the definition of "physical injury", it is not clear how any type of "physical injury" can result in death. Before an injury can result in death, the injury would presumably have to be, in fact, a "serious physical injury."

## III. MERGER

¶ 37 The trial court sentenced Bluff for three separate convictions: felony murder, child abuse, and sexual abuse of a child. Bluff now argues that her convictions for child abuse and sexual abuse of a child should merge into her conviction for felony murder, as lesser included offenses of felony murder. Bluff's merger argument is a matter of statutory interpretation, a legal question, which we review for correctness. *State ex rel. Div. of Forestry, Fire, and State Lands v. Tooele County,* 2002 UT 8, ¶ 8, 44 P.3d 680. In the context of convictions for felony murder based on aggravated robbery, we have twice held that the underlying felony does not merge with the felony murder conviction. *See State v. Bisner,* 2001 UT 99, ¶¶ 62–65, 37 P.3d 1073; *State v. McCovey,* 803 P.2d 1234, 1239 (Utah 1990). In *McCovey,* we held that

> [T]he Utah State Legislature did not intend the multiple crimes of felony murder to be punished as a single crime, but rather, that the homicide be enhanced to second degree felony murder in addition to the underlying felony. To conclude otherwise would defeat the deterrent purpose of the felony murder statute and result in unjust consequences. A true lesser included relationship does not exist in the felony murder statute....

*McCovey,* 803 P.2d at 1239.

¶ 38 In *McCovey* we based our ruling on the legislature's intent in enacting the felony murder statute. Recently, we reaffirmed *McCovey's* holding in *Bisner.* Although the question in both *McCovey* and *Bisner* was whether aggravated robbery merged with felony murder, *McCovey's* principles are applicable here. The legislature intended felony murder to be separately punishable from the underlying felony. Thus, the underlying felony does not have a "true" lesser included offense relationship in the context of felony murder.

## IV. PHOTOGRAPHIC EVIDENCE

¶ 39 At trial, Bluff moved to exclude all photographic evidence of the victim. Bluff contends on appeal that the State's four autopsy photographs were gruesome and should not have been admitted. The trial court found that the photographs were relevant and that any prejudicial effect of the photographs did not substantially outweigh their probative value. Furthermore, the trial judge determined as a matter of law that the photographs were not gruesome. The trial judge noted that, although some might find exhibits two and four gruesome, they had unusual probative value in light of the parties' disparate versions of the facts.

¶ 40 We have held that some categories of evidence, including gruesome photographs, are inherently prejudicial and should not be admitted absent a showing of "unusual probative value." *State v. Kell,* 2002 UT 19, ¶¶ 25–26, —— P.3d ——, 2002 WL 193025, 440 Utah Adv. Rep. 20; *State v. Vargas,* 2001 UT 5, ¶¶ 50–56, 20 P.3d 271; *State v. DeCorso,* 1999 UT 57, ¶ 53, 993 P.2d 837; *State v. Dunn,* 850 P.2d 1201, 1221–23 (Utah 1993); *State v. Dibello,* 780 P.2d 1221, 1229 (Utah 1989); *State v. Bishop,* 753 P.2d 439, 493 (Utah 1988)(Zimmerman, J., concurring); *State v. Lafferty,* 749 P.2d 1239, 1256 (Utah 1988); *see also State v. Cloud,* 722 P.2d 750, 752–54 (Utah 1986); *State v. Garcia,* 663 P.2d 60, 63–65 (Utah 1983). "Evidence in these categories is uniquely subject to being used to distort the deliberative process and improperly skew the outcome." *Lafferty,* 749 P.2d at 1256. The State urges this court to overrule this precedent and consider all evidence, whether gruesome or not, under the same standard pursuant to rule 403. The State argues that treating such evidence as inherently prejudicial is unnecessary and contrary to our traditional approach to determining the admissibility of evidence.

¶ 41 The State bears "a substantial burden of persuasion" in asking that precedent be overturned. *State v. Menzies,* 889 P.2d 393, 398 (Utah 1994). We believe that its argument manifests certain misapprehensions about the purpose of the presumption and the analysis a court should undertake when considering whether to admit photographs of the victim. We therefore take this opportunity to clarify our approach to potentially prejudicial photographic evidence.

¶ 42 The threshold question when considering the admissibility of any piece of evidence is whether it is relevant.[6] Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Utah R. Evid. 401 (2002). "Generally, relevant evidence is admissible and irrelevant evidence is inadmissible." *Robinson v. All–Star Delivery, Inc.,* 1999 UT 109, ¶ 26, 992 P.2d 969 (citing Utah R. Evid. 402).

¶ 43 If the proffered evidence is relevant, the court must next determine whether the evidence belongs to one of the categories of evidence that we presume to be inherently prejudicial, such as gruesome photographs. We have stated that courts should consider a number of factors when determining whether a photograph is gruesome:

First, we consider whether the photograph is in color or black and white, because color photographs are generally more disturbing because of their ability to provide the viewer with vivid images of blood, wounds, bruising, and the like.... Color alone is not determinative, however.... Second, we consider whether the photograph is an enlargement or close-up shot, again, because enlarged photographs and close-ups show greater detail and therefore are often more disturbing than a life-like view.... Also, an enlargement or close-up may give a distorted impression of the thing photographed. Third, we consider when the photograph was taken in relation to the crime and whether it depicts the victim as found at the crime scene....

Fourth, we consider whether other details in a photograph, aside from the victim, may render a photograph gruesome [because] the composition in the photograph may exacerbate the photograph's impact on the viewer.

*Vargas,* 2001 UT 5 at ¶ 52 (citing *DeCorso,* 1999 UT 57 at ¶ 50). The purpose of considering these factors is to identify photographs that have a tendency to "unfairly prejudice, inflame, or mislead the jury." *Lafferty,* 749 P.2d at 1256. Thus, these factors are not exclusive.[7] *See id.* at 1257. The court must consider any characteristics of the photograph that tend to make it more or less inflammatory.

¶ 44 If the photograph is not gruesome, the court may apply the standard rule 403 balancing test. *DeCorso,* 1999 UT 57 at ¶ 53. Under this rule, the court must admit the photograph if its probative value is not substantially outweighed by its potential to unfairly prejudice the jury. *Id.;* Utah R. Evid. 403.

¶ 45 If, however, the photograph meets the legal definition of gruesomeness, it may not be admitted absent a showing of "unusual probative value."[8] *Lafferty,* 749 P.2d at 1256. The burden is thereby shifted at this stage of the analysis to the State to show that the probative value of such evidence substantially outweighs the risk of unfair prejudice. *See Dibello,* 780 P.2d at 1229. It is true that shifting the burden to the State runs contrary to the general presumption of admissibility favored by the Rules of Evidence.[9] However, we have determined

6. The State contends that our analysis of potentially prejudicial photographs skips over relevance and goes straight to the question of gruesomeness. This is incorrect. While recent cases have not emphasized the relevance analysis, we have never overruled the fundamental principle that only relevant evidence is admissible.

7. Although recent cases have focused on only four factors, *see, e.g., State v. DeCorso,* 993 P.2d 837, 1999 UT 57 at ¶ 50, we emphasize that the photographs must be viewed as a whole and therefore at times "[o]ther factors will also come into play." *Lafferty,* 749 P.2d at 1257.

8. The State argues that the "underlying assumptions" of *Lafferty* are flawed. Specifically, they question the statement in *Lafferty* that "there is no legitimate need for the gruesome photographs of a homicide victim's corpse." 749 P.2d at 1256–57. However, the *Lafferty* court never ruled that all gruesome photographs were inadmissable, only those for which the State cannot show unusual probative value. Therefore, this statement in *Lafferty* was merely dictum and does not invalidate the underlying rationale for the rule.

9. The Rules of Evidence do, however, utilize a reverse–403 test like this one for some potentially misleading or prejudicial categories of evidence. *See Lafferty,* 749 P.2d at 1256 n. 14.

that this departure from the general rule is both necessary and equitable. The decision to admit a crime scene or autopsy photograph generally must be made early in the proceedings, before its probative value can be easily ascertained. Given that this evidence, by definition, has a tendency to confuse and inflame the jury, we believe it is appropriate for courts to err on the side of caution and exclude unfairly prejudicial evidence unless the State can show good cause for its admission. *See, e.g., Holbrook v. Flynn*, 475 U.S. 560, 567–68, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986) (noting that presumption of innocence is not necessarily enough to ensure fair trial where inherently prejudicial circumstances exist).

¶ 46 Thus, the analytic process proceeds as follows: First, we determine whether the photograph is relevant. Second, we consider whether the photograph is gruesome. Finally, we apply the appropriate balancing test. If the photograph is gruesome, it should not be admitted unless the State can show that the probative value of the photograph substantially outweighs the risk of unfair prejudice. If the photograph is not gruesome, it should be admitted unless the defendant can show that the risk of unfair prejudice substantially outweighs the probative value of the photograph.

■■■■■ ¶ 47 In considering the trial court's admission of these exhibits, we review the trial court's determination of whether the photographs are relevant for abuse of discretion. *See Bambrough v. Bethers*, 552 P.2d 1286, 1290 (Utah 1976). The determination of whether a photograph is gruesome is a question of law, which we review for correctness. *State v. Dunn*, 850 P.2d 1201, 1222 n. 22 (Utah 1993). A trial court's ruling under rule 403 is reviewed for abuse of discretion. *State v. Kell*, 2002 UT 19, ¶ 24, — P.3d —, 2002 WL 193025, 440 Utah Adv. Rep. 20. "Even if the evidence was erroneously admitted, that fact alone is insufficient to set aside a verdict unless it has 'had a substantial influence in bringing about the verdict.'" *Bambrough*, 552 P.2d at 1290 (quoting Utah R. Evid. 4(b)); *see also* Utah R. Evid. 103(a) (holding that an erroneous ruling requires

reversal only if "a substantial right of the party is affected").

¶ 48 First, with respect to relevance, we note that accident and knowledge of Rebecca's abuse were both contested issues at trial. In light of those disputes, the photographs were relevant to illustrate the degree to which the injuries themselves were consistent with the respective explanations offered for them at trial. The photographs also tended to rebut Bluff's testimony that she knew nothing of the injuries prior to Rebecca's death.

¶ 49 Next, we consider whether the photographs are gruesome. Each of the four photographs of the victim is in color and shows Rebecca's extensive abuse. We have cautioned against color photographs "because of their ability to provide the viewer with vivid images of blood, wounds, [and] bruising." *DeCorso*, 1999 UT 57 at ¶ 50. But, in this case, the challenged photographs show cleaned wounds and little, if any, blood. The bruising is certainly vivid and extensive, but the color pictures do not unfairly characterize Rebecca's bruising, her condition, or her injuries.

¶ 50 We have also cautioned against enlargements or close-ups because they "show greater detail and therefore are often more disturbing than a life-like view ... or may give a distorted impression of the thing photographed." *Id.* Each photograph here measures 8x10 inches. Only one of the photographs depicts the full body (rear view) of the victim. The remaining three photographs focus on the victim's buttocks and head. These three photographs do show greater detail, but we do not find that they distort the "thing photographed" in any way. Not one of the photographs was taken at the crime scene. As a result, the photographs do not show unnatural body contortions. *Cf. State v. Lafferty*, 749 P.2d 1239, 1257 (Utah 1988) (holding that crime scene photographs that showed a baby with a gaping neck wound repositioned in a crib with a toy and a baby bottle were prejudicial).

¶ 51 Finally, we consider whether other details in the photographs, other than the victim, render the photographs gruesome. Bluff argues that extraneous objects such as

metric cards, gloved hands, towels, a toe tag, an examiner card and case number, and the examining table "exacerbate the photograph's impact on the viewer." We disagree. While some details in the photographs are unpleasant, they are primarily due to the injuries inflicted on Rebecca, not to any foreign object. The sterile and clean manner in which the victim's body is depicted negates the effect of these foreign objects. While these photographs accurately show Rebecca's various injuries, including their placement and pattern, we find nothing otherwise inflammatory in them. The trial court correctly held that the photographs are not gruesome.

¶ 52 Having determined that the photographs are not gruesome, we proceed to analyze whether the trial judge erred in admitting the photographs under rule 403. As stated earlier, "[u]nder rule 403 of the Utah Rules of Evidence, the trial court should only exclude relevant evidence if its 'probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *State v. Vargas,* 2001 UT 5, ¶ 51, 20 P.3d 271 (quoting *State v. DeCorso,* 1999 UT 57, ¶ 48, 993 P.2d 837).

¶ 53 Bluff argues that the unfair prejudicial effect of the photographs of the victim substantially outweighs any probative value the photographs might present.[10] The trial court specifically noted that the disparate versions of the events leading up to Rebecca's death created a situation where the photographs had unusual probative value. Experts certainly could have testified that Rebecca's injuries were not accidental, and in fact the experts did testify, but the photographic illustrations of the nature of the injuries were still highly probative of the State's contention that Bluff knew about Re-

becca's injuries and that the injuries did not result from an accidental fall down the stairs. Because these factual issues were at the heart of this trial, we conclude that the probative value of the photographs substantially outweighed any prejudicial effect they may have had.[11]

¶ 54 We are not persuaded that the foregoing method of analysis, established by our precedent, should be abandoned, and we decline the State's invitation to do so.

## V. VIDEOTAPE EVIDENCE

¶ 55 Bluff argues on appeal that the trial court abused its discretion in admitting evidence summarizing parts of a videotape of Bluff, Andrew, and Suzanna engaging in "sadomasochistic sex acts." Bluff claims that the summary impermissibly introduced character evidence to show propensity. Even if the evidence was properly admitted under rule 404(b) of the Utah Rules of Evidence, Bluff claims that the evidence's "probative value is substantially outweighed by the danger of unfair prejudice."

¶ 56 "[I]n deciding whether evidence of other crimes is admissible under rule 404(b), the trial court must determine (1) whether such evidence is being offered for a proper, noncharacter purpose under 404(b), (2) whether such evidence meets the requirements of rule 402, and (3) whether this evidence meets the requirements of rule 403." *State v. DeCorso,* 1999 UT 57, ¶ 20, 993 P.2d 837. A trial court's admission of evidence under rule 404(b) is reviewed under the abuse of discretion standard. *Id.* at ¶ 18. As noted above, a trial court's ruling under rule 403 is also reviewed for abuse of discretion. *State v. Kell,* 2002 UT 19, ¶ 24, ⸺ P.3d ⸺, 2002 WL 193025, 440 Utah Adv. Rep. 20. Other crime evidence is admissible

---

**10.** Although we described four factors in *DeCorso* (color photographs, enlargements, crime scene, and other details in the photograph) to determine whether the photograph is gruesome, these same factors can also appropriately be used in the balancing test under rule 403 of the Utah Rules of Evidence to determine if the probative value of the photographs substantially outweighs their unfair prejudicial effect. *See State v. Lafferty,* 749 P.2d 1239, 1256–57 (Utah 1988) (applying the four factors, in addition to other factors, to deter-

mine whether the probative value of photographs substantially outweighed their unfair prejudicial effect).

**11.** Bluff also argues on appeal that prejudicial evidence raises constitutional concerns. Because the evidence was not unfairly prejudicial, we decline to address the constitutional ramifications of unfairly prejudicial evidence admitted at trial.

if it "tends to prove some fact that is material to the crime charged—other than the defendant's propensity to commit crime." *DeCorso*, 1999 UT 57 at ¶ 22. Although the contested evidence in *DeCorso* was evidence of a prior crime, the acts here appear to have been perfectly lawful, whereas we find the reasoning of that case applicable and persuasive.

¶ 57 The trial judge determined that the videotape evidence was properly admitted for non-character purposes to establish identity, knowledge, absence of accident, and to address the contention of the defendants that they were not the perpetrators of the unusual injuries suffered by this victim. Identity, knowledge, and absence of accident were central issues in the case. Bluff claimed that Rebecca's injuries were suffered from a single fall down the stairs. Dr. Frikke testified that the pattern of the injuries on Rebecca's body were consistent with the type of injuries that would be inflicted by the devices used by Bluff and the others in the videotape. The contents of the videotape therefore evidenced a lack of accident by showing a probable means whereby the pattern injuries were intentionally inflicted. The videotape evidence also established that Bluff knew how to use the whips in question, serving to show both identity and knowledge. The videotape evidence helped the prosecution to rebut Bluff's contention that she did not inflict or participate in inflicting the pattern injuries on Rebecca. We therefore conclude that the evidence was properly admitted for non-character purposes under rule 404(b).

¶ 58 Next we review the trial court's determination of whether the videotape evidence was relevant under rule 402. The trial court determined that the videotape evidence was relevant because it corroborated the testimony of the physicians and Dr. Frikke regarding the intentional nature of Rebecca's injuries, which were consistent with having been inflicted by instruments similar to those used by Bluff in the videotape. The trial judge also determined that the videotape evidence was relevant to rebut Bluff's contention that the injuries were caused by an accidental fall down the stairs. We agree with the trial

judge's analysis and disposition under rule 402.

¶ 59 Finally, we review the trial court's determination under rule 403 to ensure the trial judge did not abuse his discretion in admitting the videotape evidence.

> In deciding whether the danger of unfair prejudice and the like substantially outweighs the incremental probative value, a variety of matters must be considered, including the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for evidence, the efficacy of alternative proof, and the degree to which the evidence will rouse the jury to overmastering hostility.

*State v. Shickles*, 760 P.2d 291, 295–96 (Utah 1988) (quoting E. Cleary, *McCormick on Evidence* § 190, at 565 (3d ed.1984)). Even though we have applied these factors in the past to "crimes," we think they are equally applicable to determine the prejudicial effect of a "wrong or act" as described in rule 403.

¶ 60 The behavior captured by the videotape was sufficiently similar to the acts that were, according to expert testimony and the photographs, perpetrated on Rebecca, to make its admission highly relevant to the questions of identity, knowledge, and accident. Although the State had expert testimony of the cause of Rebecca's injuries, and physical evidence of the presence of whips and restraints in Bluff's residence, the need for evidence to rebut the defenses of lack of mistake, identity, and knowledge was sufficient to permit the contents of the videotape to be summarized for the jury. We note that the videotape itself was not shown to the jury, thus considerably minimizing its impact. Instead, the trial court permitted only oral testimony about its contents and gave the jury a cautionary instruction about evidence of other acts. A police officer testified regarding only two scenes, each of which depicted Bluff's and Andrew's ability to use the restraints and whips that had previously been introduced into evidence. The officer's testimony was presented in a sterile manner, was focused on issues other than propensity, and was carefully tailored to minimize the

somewhat sensational nature of the conduct. We conclude that the probative value of the evidence was not substantially outweighed by its prejudicial effect.

## VI. "CONTROL" IN THE CHILD ABUSE STATUTE

¶ 61 Bluff argues that she is not guilty of child abuse because the language of the child abuse statute implies that she must have the ability to control the person inflicting injury, as indicated by the word "permits" in the statute. We have not previously addressed the meaning of "permits" as used in the child abuse statute. The statute provides that "[a]ny person who inflicts upon a child serious physical injury or, having the care or custody of such child, *causes or permits another to inflict* serious physical injury upon a child is guilty of an offense." Utah Code Ann. § 76–5–109(2)(2001) (emphasis added). "When faced with a question of statutory construction, 'we seek to give effect to the intent of the legislature in light of the purpose the statute was meant to achieve.'" *State v. Ostler,* 2001 UT 68, ¶ 7, 31 P.3d 528. We do not look beyond the plain language of the statute unless we find ambiguity in the statute. *Id.*

¶ 62 We do not believe that the notion of ability to control another can properly be read into the statute. The purpose of the statute is to prevent child abuse both by prohibiting the direct infliction of injury on a child and by affirmatively requiring the child's caregiver to take steps to prevent another person from abusing the child. The statute does not require the caregiver to "control" the perpetrator, but requires the caregiver to take action to prevent the abuse, whether by direct intervention, seeking emergency assistance, notifying authorities, or flight, to name a few options. The State has no obligation to prove that the caregiver can control the perpetrator in order to establish the "permits" element of the offense. Showing the impossibility of intervention by the caregiver is the burden of the defense.

## VII. SUFFICIENCY OF THE EVIDENCE

¶ 63 In examining the sufficiency of the evidence to sustain a jury verdict against a criminal defendant, we do not reexamine the evidence to determine whether we believe the evidence establishes guilt beyond a reasonable doubt, but instead,

> we will conclude that the evidence was insufficient when, after viewing the evidence and all inferences drawn therefrom in a light most favorable to the jury's verdict, the evidence 'is sufficiently inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime for which he or she was convicted.'

*State v. Holgate,* 2000 UT 74, ¶ 18, 10 P.3d 346 (quoting *State v. Dunn,* 850 P.2d 1201, 1212 (Utah 1993)). "We note that the trial court considered defendant's insufficiency of the evidence claim.... This action lends further weight to the jury's verdict." *State v. Brown,* 948 P.2d 337, 344 (Utah 1997) (citing *State v. Johnson,* 821 P.2d 1150, 1156 (Utah 1991)).

¶ 64 Bluff concedes on appeal that Rebecca is her child, that Bluff had exclusive care and custody of Rebecca during the period in which her injuries were suffered, that Rebecca's death was caused by child abuse, and that Rebecca was sexually abused. Bluff contends, however, that she did not possess the requisite mental state for murder, that she was not an accomplice, that she did not sexually abuse Rebecca, and that she did not inflict or cause someone else to inflict Rebecca's injuries. We have already determined that the mental state required by the felony murder statute is the intent to commit the underlying felony, not the intent to commit murder. *See supra* Part I. Bluff's renewed mens rea argument with respect to felony murder is therefore unavailing.

¶ 65 With regard to Bluff's three convictions for felony murder, child abuse, and sexual abuse of a child, the State provided substantial evidence of Bluff's guilt as either a principal or an accomplice. The State offered evidence that Bluff was Rebecca's sole caregiver, as Rebecca was in Bluff's care "24/7"; Rebecca suffered extensive abuse and injuries while in Bluff's care; Rebecca had been sexually abused; Rebecca's re-

straint and whip-like injuries were not inflicted accidentally; Bluff knew how to use whips and restraints; and Rebecca's non-accidental injuries resulted in her death. We conclude that the jury considered evidence, both direct and circumstantial, sufficient to support the conclusion that Bluff was guilty beyond a reasonable doubt on all three counts.

## VIII. CONSECUTIVE SENTENCES

¶ 66 Bluff argues on appeal that the trial court abused its discretion in sentencing her to consecutive sentences for child abuse, sexual abuse of a child, and felony murder convictions. We afford the trial court wide latitude in sentencing and, generally, "will reverse a trial court's sentencing decision only if it is an abuse of the judge's discretion." *State v. Helms,* 2002 UT 12, ¶ 8, 40 P.3d 626. The trial court abuses its discretion when it fails to consider all legally relevant factors, or if the sentence imposed exceeds the limits prescribed by law. *Id.* at ¶ 8; *State v. Gibbons,* 779 P.2d 1133, 1135 (Utah 1989). "Indeed, we have recognized that sentencing reflects the personal judgment of the court, and consequently, a sentence imposed by the trial court should be overturned only when it is inherently unfair or clearly excessive." *Helms,* 2002 UT 12 at ¶ 14 (citing *State v. Woodland,* 945 P.2d 665, 671 (Utah 1997)).

¶ 67 Bluff further argues that the State did not prove that she actually abused her child; she contends that Andrew was the culpable party. Bluff also cites *State v. Galli,* 967 P.2d 930 (Utah 1998), for the proposition that consecutive sentences should not be imposed for her conduct because the proof of her involvement was inadequate, the incident involved a single victim, the victim's death was caused by injuries for which Bluff was already being punished, she did not have a prior criminal history, and she was a "productive member of society." We will not address all of Bluff's factual contentions. Bluff's reliance on *Galli* is easily distinguishable; that case did not involve physical harm or death to the victims, the defendant confessed and admitted responsibility for his crimes, and the defendant's conduct in the three years between the crime and the time he was arrested showed an ability to rehabilitate himself and become a productive member of society. *Id.* at 938. No similar considerations exist here.

¶ 68 While the trial court did not specifically address the enumerated factors in Utah Code section 76–3–401(4), the transcript of the sentencing hearing indicates that he adequately considered them. The trial judge found that the heinous nature of the crimes, Bluff's indifference to Rebecca's injuries, and Bluff's position and contentions at trial led him to believe that consecutive sentences were appropriate. We conclude that the trial court, in its assessment of Bluff's character and the nature of the crime, did not abuse its discretion in sentencing Bluff to consecutive sentences for her child abuse, sexual abuse of a child, and felony murder convictions.

## CONCLUSION

¶ 69 The trial court did not err in refusing to give Bluff's proposed jury instructions and in refusing to instruct the jury on Bluff's theory of the case. Child abuse homicide and felony murder based on felony child abuse do not contain identical elements; therefore, the *Shondel* doctrine does not apply. Felony murder is an enhancement statute wherein the underlying felony does not merge with the felony murder conviction. The trial court correctly determined that the autopsy photographs of the victim were not gruesome and did not abuse its discretion in admitting them. The trial court did not abuse its discretion in admitting the videotape evidence of Bluff's prior. The jury was presented with sufficient evidence to convict Bluff on all three counts. Finally, the trial court did not abuse its discretion in sentencing Bluff to consecutive sentences. We therefore affirm.

¶ 70 Associate Chief Justice DURRANT, Justice HOWE, Justice RUSSON, and Justice WILKINS concur in Chief Justice DURHAM's opinion.