2011 UT App 54

**STATE of Utah, Plaintiff and Appellee,**

v.

**Scott Tyler STAPLEY, Defendant
and Appellant.**

No. 20090318–CA.

Court of Appeals of Utah.

Feb. 25, 2011.

Before Judges DAVIS, THORNE, and ROTH.

## MEMORANDUM DECISION

ROTH, Judge:

¶ 1 Scott Tyler Stapley appeals his conviction of attempted murder, alleging that the trial court erred in admitting gruesome photographs of the victim's injuries. We affirm.

¶ 2 Stapley and Cody Augustine [1] attacked seventeen-year-old J.E. outside J.E.'s home around 4:30 a.m. on July 29, 2008. In the hours leading up to the attack, Stapley and Augustine had been drinking alcohol at Stapley's apartment. Augustine told Stapley's roommate that he thought he had a sexually transmitted disease (STD). Augustine believed he had contracted the STD from his girlfriend (Girlfriend), who he believed had contracted it from J.E. While Stapley was present, Augustine told Stapley's roommate, " 'I swear to God if I have an STD, I am going to kill him.' " Stapley responded, " 'I got toys.' "

¶ 3 Later that night, posing as Girlfriend, Augustine exchanged text messages with J.E., and J.E. and "Girlfriend" eventually agreed to meet up at J.E.'s house. Stapley and Augustine then drove to J.E.'s house. Shortly before arriving, Augustine sent J.E. a text message that "she" was there, leading J.E. to believe that Girlfriend was there to meet him. J.E. was pacing on the sidewalk in front of his house when Stapley and Augustine arrived. When J.E. disappeared behind a utility truck that was parked in front of his house, Stapley told Augustine, " '[N]ow or never. If you are going to go, go. I'll be right behind you.' "

¶ 4 Augustine exited the car and ran at J.E. with a knife. J.E. fled toward the middle of the street where Stapley was waiting. Stapley, who was carrying a sort of battle-ax (the ax),[2] "came around from behind" and

Linda M. Jones and Scott A. Wilson, Salt Lake City, for Appellant.

Mark L. Shurtleff and Kris C. Leonard, Salt Lake City, for Appellee.

1. We recite the facts in accordance with the jury's verdict but acknowledge that, at the time of Stapley's trial, Augustine had been neither tried nor convicted.

2. The ax itself was admitted as an exhibit at trial, but the ax is not part of the record on appeal. At various times in the transcripts, the ax is referred to as a battle-ax, which is defined as "a broadax formerly used as a weapon of war," *Webster's Ninth New Collegiate Dictionary* 135 (9th ed.

"hit [J.E.] in the back of the neck" with the ax. After being struck, J.E. doubled back, where he ran into Augustine. While J.E. and Augustine wrestled for a few moments, Stapley moved around the utility truck so that he was between J.E. and his house. J.E. then broke free from Augustine and ran toward his house, where he again encountered Stapley. As J.E. passed Stapley, Stapley hit him again with the ax across the front of his neck and his left shoulder. Augustine followed J.E. as he ran up the driveway and behind the house. When Stapley heard screams a few moments later, he yelled to Augustine, " 'Let's get out of here. Let's bail.' " In total, J.E. was struck by Stapley's ax and Augustine's knife twelve times. He was hospitalized for five days and underwent two different surgeries to close the wounds and to repair the damage to his colon that resulted from a knife wound.

¶ 5 Stapley was subsequently arrested. During questioning, an officer asked him whether he believed hitting someone with the ax could result in death. Stapley replied, "I would be lying if I said I didn't think it might, but I never really thought about it; I was just there to back up my friend." In his written statement, he admitted that he " 'hit [J.E.] in the [back] right shoulder' " with the ax, then " 'ran after [J.E.], [and] got him one more time in the [front] left shoulder.' "

¶ 6 While in jail a few days later, Stapley spoke with friends on the phone about the event, describing himself as a "soldier." During the call, Stapley described the event and acknowledged that he and Augustine had lured J.E. outside. He described how he had swung the ax, how and where it had hit J.E., and how he had blocked J.E.'s escape. He also stated that he was "surprised that the kid is still alive," although he maintains that he said this only because he had seen Augustine return from behind the house covered in

blood and claims that the statement was not indicative of his intent to kill.

¶ 7 Stapley was charged with attempted murder, a first degree felony, see Utah Code Ann. § 76–4–101(1) (2008) (elements of attempt); id. § 76–5–203(2)(a) (Supp. 2010) (elements of murder); id. § 76–4–102(1)(c)(i) (2008) (classifying attempted murder under sections 76–4–101(1) and 76–5–203(2)(a) as a first degree felony).[3] He pleaded not guilty and was tried by a jury. During the trial, the court admitted five eight-inch by ten-inch color photographs of J.E.'s injuries—exhibits 10 through 14—which are now the subject of this appeal. Exhibit 10 depicts knife wounds to J.E.'s back and left shoulder. Exhibit 11 shows the wide, gaping ax wound on the back of J.E.'s neck, with blood matting his hair, and a knife wound on the back of his left shoulder. Fresh blood also covers his neck and shoulders. Exhibit 12 shows the ax wound to the front of the neck and an ax wound similar in size and severity to the one depicted in exhibit 11 to J.E.'s left shoulder.[4] There is dried blood on J.E.'s torso and some fresh blood coming from the wounds. J.E.'s face is visible in the photograph. Exhibit 13 is a view of the same wounds as in exhibit 12, although there is less blood and the neck injuries are shown in greater detail. Exhibit 14 shows knife wounds to J.E.'s lower torso and fingers. Following the presentation of evidence, the trial court instructed the jury on the elements of attempted murder as well as the elements of the lesser included offenses of aggravated assault with a dangerous weapon and aggravated assault with serious bodily injury, see id. § 76–5–103 (2008) (current version at id. (Supp. 2010)). The jury convicted Stapley of attempted murder.

¶ 8 Stapley now challenges the trial court's decision to admit exhibits 10 through 14 into evidence. Stapley alleges that the photographs are irrelevant and gruesome. In addition, he contends that because the photo-

---

1986); see also id. at 180 (defining "broadax" as "a large ax with a broad blade"). Although a precise description of the ax is not included in the record, it is apparent that it had at least two—possibly as many as four—crescent shaped blades, which were arrayed at right angles to each other.

3. Except where otherwise noted, we cite to the current version of the Utah Code as a convenience to the reader because the relevant language is identical to the language in effect on July 29, 2008.

4. The undisputed testimony at trial was that the ax wounds to the front of J.E.'s neck and his left shoulder were caused by one strike.

graphs are gruesome, the State did not meet its burden of demonstrating that the photographs had unusual probative value that substantially outweighed the unfair prejudice or confusion to the jury created by the exhibits. *See generally State v. Vargas*, 2001 UT 5, ¶ 51, 20 P.3d 271 (making gruesome photographs presumptively inadmissible unless the state shows that the probative value substantially outweighs the risk of unfair prejudice to the defendant).

▆▆ ¶ 9 Before reaching the merits of Stapley's claims, we must consider the State's contention that some of them are not preserved for appeal. Prior to trial, Stapley objected to the admission of some of the photographs "because they are gruesome." He objected, however, only to the photographs of "wounds inflicted by an ax on the back neck and front neck and [front] left shoulder of the victim," specifically exhibits 11, 12, and 13. Stapley did not object to exhibits 10 and 14, which depict the knife wounds allegedly inflicted by Augustine or to the presence of a knife injury in exhibit 11. During trial, Stapley made the "same objection." Stapley now argues on appeal that photographs depicting the knife wounds inflicted by Augustine were not relevant. Because Stapley did not make this objection below, however, he has waived the issue for appellate review. *See generally Clegg v. Wasatch Cnty.*, 2010 UT 5, ¶ 35, 227 P.3d 1243 (" '[T]o preserve an issue for appellate review, a party must first raise the issue in the trial court,' because 'a trial court must be offered an opportunity to rule on an issue.' " (alteration in original) (citations omitted)). Stapley also asserts that the State violated a court order prohibiting it from using duplicate photographs of J.E.'s injuries when it moved for admission of exhibits 12 and 13, which depict the same injuries. Because Stapley did not raise this issue in the trial court, we decline to consider it for the first time on appeal. *See id.* We therefore consider Stapley's gruesomeness arguments only with respect to the ax wounds depicted in exhibits 11, 12, and 13.

▆▆ ¶ 10 Under rule 403 of the Utah Rules of Evidence, there is a general presumption that relevant evidence is admissi-

ble. *See State v. Betha*, 957 P.2d 611, 614 (Utah Ct.App.1998). Some categories of evidence, however, do not enjoy this presumption because they are " 'uniquely subject to being used to distort the deliberative process and improperly skew the [trial's] outcome.' " *Id.* (alteration in original) (quoting *State v. Lafferty*, 749 P.2d 1239, 1256 (Utah 1988)). Gruesome photographs make up one of these categories. *See id.* These categories of evidence "require a showing of 'unusual probative value' before admission." *Id.* (quoting *Lafferty*, 749 P.2d at 1256). Thus, the Utah Supreme Court has adopted a three-part test for determining whether an allegedly gruesome photograph is admissible:

> First, [the court] determine[s] whether the photograph is relevant. Second, [it] consider[s] whether the photograph is gruesome. Finally, [it] appl[ies] the appropriate balancing test. If the photograph is gruesome, it should not be admitted unless the State can show that the probative value of the photograph substantially outweighs the risk of unfair prejudice. If the photograph is not gruesome, it should be admitted unless the defendant can show that the risk of unfair prejudice substantially outweighs the probative value of the photograph.

*State v. Bluff*, 2002 UT 66, ¶ 46, 52 P.3d 1210.

▆▆ ¶ 11 On appeal, we review the trial court's determination that a photograph is relevant for abuse of discretion. *See State v. Gulbransen*, 2005 UT 7, ¶ 35, 106 P.3d 734. "Whether a photograph is gruesome is a question of law, which we review for correctness." *Id.* (internal quotation marks omitted). Finally, we will review "[t]he trial court's ultimate ruling under rule 403 of the Utah Rules of Evidence" for abuse of discretion. *See id.*

## I. Relevance

▆▆ ¶ 12 Stapley's first argument on appeal is that the photographs are inadmissible because they are irrelevant. We disagree. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it

would be without the evidence." Utah R. Evid. 401. Exhibits 11, 12, and 13 show the nature and extent of J.E.'s wounds, which are relevant to establishing the "intent to kill" element of the attempted murder charge as well the "serious bodily injury" element of the lesser included aggravated assault charge. Furthermore, the gravity of the wounds as they appear in the photographs make Stapley's statement that he was "surprised that the kid [J.E.] is still alive" more likely to be evidence of intent and knowledge that the ax was a dangerous weapon, capable of causing death or serious bodily injury, than merely of his reaction to Augustine's returning to the car covered in blood.

¶ 13 Stapley does not seriously contend that the photographs are irrelevant to these elements; rather, his relevance argument focuses on the prosecution's need for the photographic exhibits. For example, Stapley openly admitted that he struck J.E. with the ax. He asserts that the photographs were therefore not relevant because they only served to prove issues that were uncontested. Stapley's assertion is misguided. "[A] stipulation of fact by defense counsel does not make evidence less relevant, nor is it a basis for depriving the prosecution the opportunity of profiting from the legitimate moral force of its evidence in persuading a jury." *Gulbransen*, 2005 UT 7, ¶ 37, 106 P.3d 734 (internal quotation marks omitted). "[S]o long as the defendant maintain[s] his [not] guilty plea, the State ha[s] the right to prove its case up to the hilt in whatever manner it [chooses], subject only to the rules of evidence and standards of fair play." *State v. Florez*, 777 P.2d 452, 455 (Utah 1989) (internal quotation marks omitted); *accord Gulbransen*, 2005 UT 7, ¶ 37, 106 P.3d 734. Moreover, the photographs are relevant not just to the fact that Stapley struck J.E. but also to the severity of J.E.'s wounds and the force with which they were inflicted. *Cf. State v. Calliham*, 2002 UT 87, ¶ 38, 57 P.3d 220 (concluding that photographs of crime scene and victim were properly found to be relevant where they corroborated one witness's testimony that the defendant was the killer even though the manner and place of the killing were uncontested).

¶ 14 Stapley also asserts that the photographs were irrelevant because information about the nature and placement of the wounds he inflicted on J.E. could have been established through the testimonies of J.E. himself and Dr. Thomas White, the physician who treated him. The Utah Supreme Court, however, has held that the "fact that the same evidence could have been provided by purely testimonial means does not necessarily make a photograph inadmissible." *Gulbransen*, 2005 UT 7, ¶ 38, 106 P.3d 734 (internal quotation marks omitted). The challenged photographs depicted to the jury the precise location, size, and depth of the wounds, providing a visual aid to Dr. White's clinical testimony. Such evidence is relevant to the State's contention that Stapley had an intent to kill J.E., an element of attempted murder that the State must show beyond a reasonable doubt. It is also relevant to the State's case that he inflicted serious bodily injury sufficient to support an aggravated assault conviction and did so intentionally. We therefore hold that the trial court did not abuse its discretion in ruling that the photographs were relevant.

## II. Gruesomeness

¶ 15 Next, Stapley argues that exhibits 11, 12, and 13 are gruesome because they are "close-up [color] shot[s] of . . . gaping laceration[s] . . . with exposed tissue and fluid, and dried blood." To determine whether a photograph is gruesome, courts consider a variety of factors, which include, but are not limited to, "whether the photograph is in color or black and white; whether it is an enlargement or close-up shot; when the photo was taken in relation to the crime; and whether other details in the photo, aside from the victim, may exacerbate the photograph's impact on the viewer." *Gulbransen*, 2005 UT 7, ¶ 39, 106 P.3d 734 (internal quotation marks omitted). A photograph is not gruesome, however, merely because it is unpleasant to view. *See State v. Jiron*, 882 P.2d 685, 690 (Utah Ct.App.1994) (affirming the trial court's conclusion that a cropped photograph of the victim's nonfatal anal injuries was not gruesome). Rather, gruesome means " 'something much stronger than being offensive, embarrassing, or graphic . . . .

[I]t inspir[es] horror or repulsion. Synonyms include grisly and hideous.'" *State v. Betha*, 957 P.2d 611, 615 (Utah Ct.App.1998) (quoting *Jiron*, 882 P.2d at 690) (additional quotation marks omitted).[5] The trial court here acknowledged the disturbing nature of the pictures when it stated that the photographs "are extremely troubling ... to view" and "are very graphic and very sobering." Indeed, the trial judge observed, "[T]hey are some of the worst photographs I have seen ... hands down." Ultimately, though, after considering the factors laid out by the supreme court, she determined the photographs were "not gruesome." In recognition of their "very disturbing" nature, however, the court decided to "limit the[ir] exposure" to the jury by ordering the State to present only one photograph of each injury at trial.

¶ 16 Our reaction on appeal is similar to that of the trial court. The color exhibits depict very disturbing and unpleasant details of J.E.'s injuries, but they also accurately depict the injuries Stapley admitted he inflicted. Indeed, the disturbing nature of the photographs is a function of the injuries themselves, not the result of a deliberate attempt by the State to distort or highlight the extent of the injuries. However, for purposes of this appeal, we will assume, without actually deciding, that the photographs are gruesome and will consider them as if presumptively inadmissible. Nevertheless, we ultimately conclude that the State met its burden of showing that the photographs were admissible due to their unusual probative value in light of the issues raised at trial.

### III. Rule 403 Balancing Test

¶ 17 Based on its conclusion that exhibits 11, 12, and 13 were not gruesome, the trial court considered the photographs'

admissibility under the presumption that they were admissible unless the defense demonstrated that their probative value was substantially outweighed by the risk of unfair prejudice. *See generally State v. Bluff*, 2002 UT 66, ¶ 44, 52 P.3d 1210 (stating that a non-gruesome photograph must be admitted unless the risk of unfair prejudice substantially outweighed its probative value). Because we are assuming, for purposes of this appeal, that the photographs are gruesome, we must apply the presumptively inadmissible standard. *See generally State v. Vargas*, 2001 UT 5, ¶ 51, 20 P.3d 271 (making gruesome photographs presumptively inadmissible). We therefore consider whether their evidentiary significance was sufficient to overcome the presumption of inadmissibility. *See id.* We conclude that it was.

¶ 18 In conducting this analysis, we take into account only "unfair" prejudice. *See Woods v. Zeluff*, 2007 UT App 84, ¶ 7, 158 P.3d 552 ("[P]rejudice alone is not sufficient justification to exclude the evidence. Rather, the balancing test under rule 403 requires measuring the danger of unfair prejudice."). Unfair prejudice is defined as having "'an undue tendency to suggest decision on an improper basis, commonly but not necessarily an emotional one, such as bias, sympathy, hatred, contempt, retribution or horror.'" *Id.* (quoting *State v. Maurer*, 770 P.2d 981, 984 (Utah 1989)). We agree that the contested photographs have "a considerable emotional impact." *See State v. Garcia*, 663 P.2d 60, 64 (Utah 1983). And because we are assuming the photographs are gruesome, we attribute to them "an unusually strong propensity to unfairly prejudice, inflame, or mislead a jury." *See State v. Lafferty*, 749 P.2d 1239, 1256 (Utah 1988); *accord Jiron*, 882

---

5. Some cases in which the Utah appellate courts have found photographs of gaping and bloody wounds to be gruesome include *State v. Bishop*, 753 P.2d 439 (Utah 1988), *overruled on other grounds by State v. Menzies*, 889 P.2d 393, 400 (Utah 1994), where a homicide victim's head wounds were displayed with tongs pulling away skin to show brain cavity, *see id.* at 476–77; *State v. Lafferty*, 749 P.2d 1239 (Utah 1988), in which a deceased toddler was positioned in the crib to highlight her gaping neck wound and a deceased woman was shown on the floor in a pool of blood, *see id.* at 1257; and *State v. Cloud*, 722

P.2d 750 (Utah 1986), where the photographs show the victim lying in a pool of coagulated blood with specific stab wounds visible, *see id.* at 753–54. We do recognize, however, that in each of these cases, the victim's wounds were exaggerated or highlighted, whereas in this case, J.E.'s gaping wounds were only the result of being struck by a broad curved ax. *See State v. Betha*, 957 P.2d 611, 615 (Utah Ct.App.1998) (affirming the trial court's decision that photographs were not gruesome where "[t]hey merely accurately reflect the ... injuries of an 'aggravated assault' victim").

P.2d at 690. Even recognizing that the photographs can create a measure of unfair prejudice to Stapley by, for example, eliciting sympathy for J.E., creating revulsion for Stapley as the person who inflicted the wounds, or both, we agree with the trial court that the photographs' "probative value is extremely high" under the circumstances of this case.

¶ 19 Stapley's primary defense at trial was that he did not have the intent to kill J.E. He testified that when Augustine first began talking about confronting J.E., he attempted to talk Augustine out of it. It was only when Augustine insisted that he was going to "make [J.E.] pay" "with or without" him that Stapley decided he was going to help his friend by "back[ing him] up" in case others were there. Despite another witness's testimony that Augustine had threatened to kill J.E., Stapley maintained that he had not heard Augustine use the word "kill" that night but rather understood Augustine to be planning merely an assault. Stapley also testified that his swings were reflexive and accidental as opposed to deliberate. He explained that he swung the ax at J.E.'s shoulder and arm, not his head or neck, the area where the wounds actually occurred. To further support his defense that he did not intend to kill J.E., Stapley put on evidence that he did not chase J.E. up the driveway, that he felt remorse for what he had done, that he was crying after he left the scene, that he confessed his involvement immediately upon being confronted by the police, and that he assisted the police in recovering the ax.

¶ 20 To prove its attempted murder or lesser included assault charges, the State was required to prove that Stapley acted volitionally. Stapley testified that he struck J.E. the first time out of reflex because J.E. "was coming right at [him]." Stapley then claimed that the second blow was accidental as he "was thrown off balance" when J.E. ran into him while fleeing Augustine. Stapley asserted that he "didn't swing with the ax" but that he "hit [J.E.] with [his] fist not the ax[ ]" and that "[J.E.] ran through the ax[ ]." Dr. White testified that the wounds were consistent with a chop and they were of the same length and depth, which indicates they were inflicted with the same amount of force. The photographs were a significant visual confirmation of that testimony, showing wounds of similar gravity at each site of injury, which tended to counter Stapley's contentions that one injury was inflicted by Stapley actively swinging the ax (though according to him, without conscious purpose) and the other by J.E. running into the ax. Thus, the photographs "were essential in helping the jury resolve whether the wounds were caused intentionally or accidentally." *See State v. Betha,* 957 P.2d 611, 615 (Utah Ct.App.1998); *see also Bluff,* 2002 UT 66, ¶ 53, 52 P.3d 1210 (stating that where a central issue at trial was whether the injuries were accidentally or intentionally inflicted, the photographs of a homicide victim's injuries were highly probative of the state's theory even when its experts had already testified that the injuries were not accidental).

¶ 21 In addition, in order to prove attempted murder, the State had to establish that "this was an attempt at a person's life as opposed to an assault." Thus, a conviction requires proof of intent to kill. *See* Utah Code Ann. § 76-4-101(1) (2008) (elements of attempt); *id.* § 76-5-203(2)(a) (Supp.2010) (elements of murder). The trial court observed that the photographs were "highly probative to the attempted homicide charge" because a jury viewing the photographs "could conclude that whoever wielded this ax[ ] was trying to cut off ... [J.E.]'s head." The trial court also recognized that exhibits 12 and 13 showed the injury over the left shoulder near the heart, which was "probative again as to his intent" to kill.[6] Addition-

---

**6.** The trial court stated that had this been a homicide case, it "might [have] exclude[d] these photographs" because the photographs would not have had unusual probative value. Indeed, Utah appellate courts have found graphic photographs of the body in murder cases to lack the high degree of evidentiary significance necessary to overcome their potential to unfairly prejudice the defendant when they are offered only to prove death and means of death—important facts but not necessarily at issue. *See, e.g., State v. Dibello,* 780 P.2d 1221, 1230–31 (Utah 1989) (holding that the portion of a video recording that lingered on the deceased's body should not have been admitted because the cause of death had been established, but concluding that the

ally, Dr. White, the surgeon who attended to J.E.'s injuries, testified that the neck injuries were within centimeters of J.E.'s carotid artery, jugular vein, and windpipe in the front of his neck and his spinal cord in the back. The photographs permit the jury to see the precise locations of the ax wounds as well as their size, depth, and severity. Thus, the photographs also assisted the jury in determining whether the nature and location of the wounds supported an inference that Stapley intended to kill J.E.

¶ 22 In the alternative to attempted murder, the State sought a conviction for aggravated assault, a lesser included offense. *See generally* Utah Code Ann. § 76-5-103(1) (2008) (current version at *id.* (Supp. 2010)) (defining aggravated assault as assault with the intentional infliction of serious bodily injury or with a dangerous weapon likely to produce death or serious bodily injury). Stapley presented a witness at trial who claimed that the ax was a toy, incapable of causing death or serious bodily injury. Stapley himself had referred to the ax as one of his "toys" during a discussion with Augustine at Stapley's apartment before the assault. The photographs accurately depict J.E.'s injuries, which include deep wounds where the ax split the muscle tissue open, making them highly probative of the capabilities of the ax and its effectiveness as a weapon.

¶ 23 Stapley also contended that no serious bodily injury occurred. *See id.* § 76-1-601(11) (2008) (defining "serious bodily injury" as "bodily injury that causes serious permanent disfigurement, protracted loss or impairment of the function of any bodily member or organ, or creates a substantial risk of death"). On cross-examination of Dr. White, the defense pointed out that the ax wounds neither caused injury to any of J.E.'s organs nor created a substantial risk of death, because despite their depth, the ax injuries had stopped short of vital organs.

J.E., however, testified that he continues to have difficulty using his left arm due to the shoulder wound. Exhibits 12 and 13 depict the size and depth of the shoulder injury and thus aid the jury in assessing whether Stapley's attack could have resulted in protracted impairment to J.E.'s shoulder.

¶ 24 Certainly, the photographs were graphic and disturbing to an unusual degree, depicting gaping and bloody wounds, as well as blood on surrounding skin and hair. They likely were shocking to the jury, as they depicted the grim toll that an edged weapon can take on the human body, something with which most members of the public have no personal experience. Nevertheless, given the nature of the case and Stapley's defense, they were highly probative of contested elements of the charged offenses and were critical to the assessment of credibility, including whether the injuries were intentionally or accidentally inflicted and whether the injuries J.E. sustained met the statutory definition of serious bodily injury. Therefore, even if we were to accept Stapley's contention that the photographs are gruesome, we hold that it was not an abuse of discretion to admit them because the record demonstrates that their probative value substantially outweighed any unfair prejudice.

¶ 25 Accordingly, we affirm.

¶ 26 WE CONCUR: JAMES Z. DAVIS, Presiding Judge and WILLIAM A. THORNE JR., Judge.

admission of the video was harmless); *Lafferty,* 749 P.2d at 1257 (determining that the trial court abused its discretion in admitting gruesome photographs of the victims' corpses where they "convey[ed] little information beyond the fact that the victims died violent and bloody deaths" but nevertheless upholding the conviction because the error was not prejudicial); *Cloud,* 722 P.2d at 753–54 (reversing the defendant's conviction where gruesome photographs of the victim's mutilated body were admitted after the defendant conceded that he had intentionally killed her with a knife). In this case, however, where J.E. did not die, the trial court explained that the photographs "are much more highly probative" of the highly contested element that Stapley had intentionally tried to kill J.E.