**2025 UT App 158**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JAYSON CHASE,
Appellant.

Opinion
No. 20230201-CA
Filed October 30, 2025

Third District Court, Salt Lake Department
The Honorable Todd M. Shaughnessy
No. 191907626

Emily Adams, Rachel Phillips Ainscough, and Jessica
Hyde Holzer, Attorneys for Appellant

Derek E. Brown and Natalie M. Edmundson,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES JOHN D. LUTHY and AMY J. OLIVER concurred.

MORTENSEN, Judge:

¶1 Jayson Chase was riding in the backseat of a car when he shot Zoey, Brenda, and Garrett[1]—three of the car's other occupants. Zoey was killed, but Brenda and Garrett both survived. At trial, Chase's defense attempted to paint Garrett as the shooter. The jury rejected Chase's version of events and convicted him on one count of aggravated murder, two counts of attempted aggravated murder, and two lesser counts.

---

1. We use pseudonyms when referring to the non-parties in this Opinion.

¶2    On appeal, Chase argues that the district court abused its discretion when it admitted six photos from Zoey's autopsy and one photo of Chase's leg tattoos that said the words "Live By The Gun, Die By The Gun." He also asserts that his attorney (Counsel) was ineffective in (1) failing to object to the State's reference during closing argument to his drug use and (2) not requesting a jury instruction on self-defense. We disagree with each of Chase's arguments and affirm his convictions.

## BACKGROUND[2]

### *The Shootings*

¶3    One night in July 2019, Chase took Garrett—his girlfriend's fifteen-year-old son—to an auto shop where people would "hang out and do drugs." After spending a few hours at the shop, Chase and Garrett decided to go home but needed a ride. Brenda, who was also at the shop that night, agreed to drive them home in her friend's sedan.

¶4    Brenda, Garrett, and Chase went to pick up two women, Alice and Zoey, who also needed a ride. Alice and Zoey were friends, and Garrett lived with Chase. Otherwise, the car's occupants did not know each other or had only very recently been introduced.

¶5    After picking up Alice and Zoey, Brenda stopped for gas. When the car got back on the road, Garrett was sitting in the back seat behind Brenda, Alice was sitting in the front seat, Chase was sitting behind Alice, and Zoey was sitting between Garrett and

_____

2. "On appeal from a jury verdict, we view the evidence in a light most favorable to that verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Dunne*, 2020 UT App 56, n.1, 463 P.3d 100 (cleaned up).

Chase. At some point, Garrett and Zoey heard a "rattling" sound. Zoey tried to determine what was causing the noise, and Garrett turned the other way to ash his cigarette out the window. About fifteen seconds later, at least four gunshots were fired. Garrett heard "[a]bout seven" "loud pops." Alice "hear[d] at least four" "really loud . . . boom noises" coming from behind her.

¶6 Two bullets struck Zoey, one in the right side of her head and the other in her right shoulder. One of the rounds hit Brenda in the back of her right shoulder. Upon hearing the gunshots, Garrett tried to shield himself by ducking and covering his head with both of his arms, and a bullet struck him, also in the back of his right shoulder. Believing that the shots had been fired from outside of the car, Brenda began driving "aggressively." Chase started screaming and kicking toward the front seat, apparently to get Brenda to stop the car. Although Brenda and Alice initially pushed Chase back, Brenda eventually stopped the car, and Garrett and Chase got out. After leaving the car, Chase threw the gun into what he described as a "corner lot." At first, Garrett tried to follow him. But when Chase aggressively asked him what he was "trying to do," Garrett turned and ran to a nearby gas station for help. The attendant called the police.

¶7 Having tossed the gun and scared Garrett off, Chase "just took off running." Realizing that he "was covered in blood," Chase "pulled [his] shirt[s] off, threw [them] right there on the ground, and just kept running." At some point, he dialed 911 and tried to tell the dispatcher his version of the events. He said that someone "started shooting at [him]" while he and others "were just driving home." Chase eventually stated that Garrett was the shooter. Chase also said that he had picked up the gun after Garrett "dumped" it.[3] Nevertheless, he told the dispatcher that he

---

3. Chase initially suggested that it was Zoey who had fired the shots: "There was a girl sitting in the middle seat. She took a lean

(continued…)

did not have the gun anymore. He said that he would be waiting at a nearby "gas station with [his] hands up until the police" arrived.

¶8     Police officers arrived at the gas station and found a shirtless Chase, who had no observable wounds or injuries but had dried blood "on the back of his head" and "on his arms." Chase said he had "grabb[ed] a gun and then toss[ed] it," but he would not say where, and the officers never found it. He also told the officers that two individuals "tried to attack him." The officers took him into custody.

¶9     After Chase and Garrett left the car, Alice noticed that Zoey was lying face down in the back seat and needed help. Instead of going to the hospital, however, Brenda drove back to the auto shop in a panic. When they arrived, Brenda got out of the car and asked a friend to "take everybody to get help." Alice also left the car to find someone to drive Zoey to the hospital. A man at the shop "came to the car, looked in the car, said 'Oh, my God,' got in the driver seat, turned the car around[,] and took off down the street."

¶10    Alice walked to her house, which was not far away from the shop. Later, Brenda also went to Alice's house. Alice went out to ask Brenda "what the hell [was] going on" but noticed that she was bleeding profusely. The two went into the home, where Alice attempted to bandage Brenda's wounds and apparently gave her a change of clothes. Alice also called the police, and two police officers came to the home to interview her. Alice gave her clothes and Brenda's clothes to the officers to be taken into evidence.

---

forward and reached over, and *she started to shoot me*." (Emphasis added.) His story instantaneously shifted, however, because the next words he said were, "I pushed her hand back. I pushed her back up, and *he* took a shot at both." (Emphasis added.)

¶11    Before the officers arrived, Brenda had left the house. She was eventually stopped by other officers in Cottonwood Heights who saw her wounds and took her to the hospital.

¶12    Finally, the man who drove Zoey to find help was also stopped by a police officer. When the officer approached the car, the driver told him that a woman in the back seat had been shot and needed help. The officer pulled Zoey out of the car and started performing chest compressions on her, but he realized quickly that she was dead.

*The Investigation*

¶13    Officers investigating the shootings soon ruled out the possibility of a drive-by shooting because the exterior of the car had not been damaged by gunfire and because at least two shell casings were clearly visible *inside* the car. Based on his 911 call, Chase "[i]mmediately . . . became a person of interest in the investigation." Officers found it suspicious that Chase had called to report an attack "with a handgun in the area at the same time frame as the shooting" and that he'd had a gun and gotten rid of it.

¶14    As the investigation progressed, the mounting evidence confirmed the officers' initial suspicion that Chase was the shooter. Investigators observed blood spatter—what one witness described as "bodily fluids blown back in the direction of the blow that causes the injury"[4]—in the back seat of the car that began in

___

4. In the proceedings below, the parties and witnesses referred to this as "splatter" evidence. The parties use the term again on appeal. While the appellate caselaw in this state overwhelmingly refers to such evidence as "spatter," it has used both terms. *Compare State v. Henfling*, 2020 UT App 129, ¶ 22, 474 P.3d 994 (spatter), *with Met v. State*, 2016 UT 51, ¶ 78, 388 P.3d 447 (splatter). *See generally* Bryan A. Garner, *Garner's Dictionary of Legal Usage*

(continued…)

the middle, where Zoey was sitting, and progressed to the right side, where Chase was sitting. This was consistent with Zoey's autopsy, which revealed that the shooter had pressed the gun against the right side of Zoey's head and pulled the trigger. And forensic testing confirmed that the blood on Chase and on his discarded shirts belonged to Zoey.

¶15 Investigators also determined that Chase fired the shots that struck Garrett and Brenda. The bullets had been fired from the back seat, and Chase was the only person sitting in the back who had not been wounded. Brenda and Garrett were both struck in the back of the right shoulder. Garrett also had stippling—"gunshot residue deposited on and in the skin near an entrance wound when a person is shot at close range," *State v. Henfling*, 2020 UT App 129, ¶ 22, 474 P.3d 994—on his right hand.

¶16 Based on this evidence, Chase was eventually charged with one count of aggravated murder, two counts of attempted aggravated murder, one count of obstruction of justice, and one count of purchase, transfer, possession, or use of a firearm by a restricted person. After a preliminary hearing, Chase was bound over for trial on all counts.

*The Trial*

¶17 Prior to trial, Chase filed a motion in limine to bar the State from asserting that he was under the influence of drugs on the day of the shootings. Appended to the motion was a document with the results of a drug test, taken two days after the shootings, purporting to show that Chase tested negative for multiple substances, including amphetamines and opioids. While the prosecutor indicated that Garrett would potentially testify about

_____

114 (3d ed. 2011) (noting that the use of term "splatter" was "rare until the 1990s" but that it is now used about half as frequently as "spatter"). We use the term "spatter" because it is the term employed more frequently by Utah's courts.

Chase's "paranoid behavior," he said that the State would not elicit testimony about Chase's use of illegal substances. Based on the State's representation, the district court determined that the motion in limine was effectively moot.

¶18 Counsel also objected when the State indicated that it would, during its opening statement, show the jury a photo of Chase's leg tattoos with the words "Live By The Gun, Die By The Gun." Specifically, Counsel expressed concern that the jury would see the tattoos and believe they were "somehow probative of [Chase's] guilt." The district court asked Counsel if he was objecting specifically on character-evidence grounds. In response, Counsel argued that the tattoos were irrelevant and prejudicial, explaining that just because "people have all kinds of weird tattoos, it doesn't mean they're murderers." The district court found that the photo was "not necessarily unfairly prejudicial under the circumstances" and overruled the objection. The prosecutor thus began his opening statement by showing the jury a photo of Chase's tattoos and saying, "'Live by the gun, die by the gun,' it's on the back of Jayson Chase's legs, tattooed. Jayson did exactly what he tattooed on the back of his legs, he lived by the gun and he shot and killed [Zoey] . . . ."[5]

¶19 Finally, Chase objected to the introduction of several photos taken during Zoey's autopsy, arguing that they were unfairly prejudicial, gruesome, or duplicative. The district court overruled the objection as to six photos—three without explanation, two to allow the State "to demonstrate the location of the bullet core and the jacket," and one to show "the recovery of the slug from the shot . . . and where it was found" in Zoey's skull.

¶20 During its case in chief, the State called Garrett, Brenda, Alice, and numerous other witnesses. The witnesses testified to

---

5. The State also introduced the photo as an exhibit during trial.

the facts described above. Garrett also testified that Chase had been paranoid on the day of the shootings.

¶21  Chase testified in his own defense. He agreed that he and Garrett had gone to the auto shop and left with Brenda, that they picked up Alice and Zoey, and that they stopped for gas. He also testified that he heard the "rattling" noise described above.

¶22  At this point, however, Chase's version of events diverged from that of the other witnesses. He claimed that after he heard the rattling sound, he saw Garrett "reach[] down," come "back up with the gun," and point it in his direction. Chase testified that he reached past Zoey to grab the gun, "turned" the gun, and "tried to pull it out of [Garrett's] hand." But, he stated, the gun discharged, which caused Chase to fall "back into the seat" and caused Zoey to fall "straight over on top of [him]."

¶23  Chase testified that he pushed Zoey away and grabbed the gun from Garrett again. But he said that the gun went off at least two more times and that Zoey fell on top of him again. Chase stated he then started kicking toward the front seat and screamed to Brenda to "[s]top the effing car." He testified that Brenda "slammed on the brakes" and that he and Garrett exited the car through the window of the door on Garrett's side of the car.

¶24  Chase testified that up until a little over a week prior to the shootings, he had been using heroin and methamphetamine—the former "pretty much on a daily basis." He stated he had then been in jail for a week and was released two or three days before the shootings. He testified that he didn't use any "legal or illegal substance[s]" while he was in jail or after his release. He suggested that he was suffering from heroin withdrawal at points during this time, an experience he described as "a nightmare."

¶25  Finally, Chase acknowledged that he had spent more than six years in federal prison for armed bank robbery and that, in a

later case, he pled guilty to unlawfully possessing a firearm. Chase called no other witnesses.

¶26 During its closing argument, the State asserted that Chase was paranoid and "either going through withdrawals from not doing drugs or . . . under the influence of the drugs he smoked that day at the shop that he went to." Counsel did not object to the State's reference to Chase's alleged drug use. The State continued, arguing that Zoey's attempt to stop the rattling sound startled Chase and caused him to believe that he was "being attacked." Chase's response, the State argued, was to shoot Zoey, Garrett, and Brenda.

¶27 Counsel argued in closing that the shootings were accidental and that Chase lacked the motive to hurt Garrett, Zoey, or Brenda. Specifically, Counsel claimed that Garrett "was like a son to" Chase and that Chase didn't know Zoey or Brenda. According to Counsel, the most likely explanation for the shootings was that Zoey had a gun in her bag, Garrett saw the gun and picked it up, and Chase ultimately did "what most any adult would try to do under those circumstances, he immediately trie[d] to take it away." Counsel argued that the gun likely went off during a physical struggle between Chase and Garrett. Counsel concluded by stating that Chase's version of events was "reasonably consistent with the evidence" and asking the jury to acquit on all counts.

¶28 Before the case was submitted to the jury, both sides requested instructions on lesser included offenses. The State requested instructions for murder on the aggravated murder charge and for attempted murder on each of the attempted aggravated murder charges. Chase requested instructions for manslaughter and negligent homicide on the aggravated murder charge. The district court gave each of the requested instructions.

¶29 The jury convicted Chase on all counts as charged. He timely appeals.

ISSUES AND STANDARDS OF REVIEW

¶30    Chase argues that the district court abused its discretion under rule 403 of the Utah Rules of Evidence in admitting the six photos from Zoey's autopsy and the photo of his tattoos. "In reviewing a trial court's decision to exclude evidence under rule 403, we will not reverse that decision absent an abuse of discretion." *State v. Jaeger*, 1999 UT 1, ¶ 21, 973 P.2d 404 (cleaned up). And "like any other evidentiary ruling, an erroneous decision to admit or exclude evidence based on rule 403 cannot result in reversible error unless the error is harmful." *State v. Williams*, 2014 UT App 198, ¶ 10, 333 P.3d 1287 (cleaned up).

¶31    Chase also asserts two ineffective-assistance claims based on Counsel's failure to (1) object to the State's reference to his drug use during closing arguments and (2) request an instruction on self-defense. When a defendant raises an ineffective-assistance claim "for the first time on appeal," as Chase does here, "there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Gonzalez*, 2021 UT App 135, ¶ 6, 501 P.3d 1205 (cleaned up).

ANALYSIS

I. Evidentiary Rulings

¶32    Citing rule 403 of the Utah Rules of Evidence, Chase argues that the district court abused its discretion in admitting the six photos from Zoey's autopsy and the photo of Chase's tattoos. We discern no error in the court's admission of the autopsy photos. We assume, without deciding, that the court abused its discretion in admitting the photo of Chase's tattoos but conclude that the admission of that photo was ultimately harmless.

A.      Autopsy Photos

¶33     Chase maintains that the district court abused its discretion under rule 403 of the Utah Rules of Evidence by admitting the photos taken during Zoey's autopsy on the basis that they "were either (1) unnecessary or (2) unfairly prejudicial because they were gruesome and likely to encourage the jury to make a decision based on emotion rather than the evidence." We disagree.

¶34     As is relevant here, rule 403 enables a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . or needlessly presenting cumulative evidence." Utah R. Evid. 403. Our supreme court has made clear that "gruesome[]" photos, assuming they are relevant, "are subject to the balancing test set out in rule 403." *Met v. State*, 2016 UT 51, ¶ 89, 388 P.3d 447. "Whether the risk of unfair prejudice substantially outweighs the probative value of the evidence typically turns on the nature of the evidence, including the number of photographs, the extent of detail depicted, and the gruesomeness of the injuries." *State v. Holm*, 2020 UT App 96, ¶ 25, 467 P.3d 934. And "[t]he burden rests on the shoulders of the party seeking to exclude the photograph to prove that its potential for unfair prejudice substantially outweighs its probative value." *Met*, 2016 UT 51, ¶ 89.

¶35     Chase argues that the photos risked "inflam[ing]" the jury because they showed Zoey's naked body "with her skull cut open and her brain exposed." According to Chase, the photos posed a substantial danger of unfair prejudice because they could have caused the jury "to make an emotional decision rather than one based on the evidence presented." Chase contrasts this potential for unfair prejudice with what he claims is the low probative value of the autopsy photos. He asserts that the medical examiner could have testified that the shootings were intentional without presenting the photos because the "only dispute" at trial was

whether Chase was the shooter. For this reason, Chase also asserts that the photos were unnecessary.

¶36 We are not persuaded. We note as an initial matter that "the State has the right to prove its case up to the hilt in whatever manner it chooses, subject only to the rules of evidence and standards of fair play." *State v. Stapley*, 2011 UT App 54, ¶ 13, 249 P.3d 572 (cleaned up); *see also State v. Cobb*, 774 P.2d 1123, 1125 (Utah 1989) ("[T]he fact that the same evidence could have been provided by purely testimonial means does not necessarily make a photograph inadmissible."). Moreover, at trial, Chase argued that the gun inadvertently discharged when he tried to take it from Garrett. Consequently, there were at least two issues: the identity of the shooter and whether the shooter acted intentionally. In *State v. Bluff*, the supreme court explained that while "[e]xperts certainly could have testified that [the victim's] injuries were not accidental, and in fact the experts did [so] testify, . . . the photographic illustrations of the nature of the injuries were still highly probative of the State's contention that [the defendant] knew about [the victim's] injuries and that the injuries did not result from an accidental fall down the stairs." 2002 UT 66, ¶ 53, 52 P.3d 1210, *abrogated on other grounds by Met*, 2016 UT 51.

¶37 Similarly, the photos here were probative of the State's contention that Chase intentionally fired the shot that killed Zoey. At least two of the photos showed that the gun had been pressed against the right side of Zoey's head when it was fired. *See State v. Todd*, 2007 UT App 349, ¶¶ 36–37, 173 P.3d 170 (explaining that a "'hard contact' wound near [the victim's] left ear" was "compelling direct evidence" that the victim in that case had not accidentally been shot). As noted, Chase had been sitting to Zoey's right. *See Cobb*, 774 P.2d at 1125 (holding that the district court properly admitted autopsy photos to refute the "defendant's accidental death theory and illustrate the probable position of [the] defendant in relation to the victim at the time of the shooting"). The State also argued that if there had been a

struggle over the gun—as Chase had claimed—the bullet likely would have followed an upward or downward trajectory. The other photos helped to demonstrate that the bullet traveled straight across Zoey's skull, not at an "angled" trajectory.

¶38 On the other side of the balancing test, the danger of unfair prejudice was low because the court admitted just six of the photos to which Chase objected. *Holm*, 2020 UT App 96, ¶ 25 (noting that the number of photos is a factor for courts to consider when assessing unfair prejudice under rule 403). And although the photos are unpleasant, "we do not perceive" them "as unfairly gruesome or disturbing." *State v. Cabututan*, 2022 UT App 41, ¶ 19, 508 P.3d 1003. For these reasons, we are not convinced that the probative value of the photos was substantially outweighed by the danger of unfair prejudice.

¶39 Consequently, the district court did not abuse its discretion in admitting the autopsy photos.

B. Photo of Chase's Tattoos

¶40 Chase argues next that the district court should have excluded the photo of his "Live By The Gun, Die By The Gun" tattoos under rule 403. He maintains that the photo was irrelevant and that its probative value, if any, was substantially outweighed by the danger of unfair prejudice. For the purpose of our analysis, we assume without deciding that the district court exceeded its discretion when it admitted the photo.

¶41 Nonetheless, we conclude that the asserted error was harmless because the jury heard other evidence that Chase had a history of committing gun-related offenses. In one instance, Chase pled guilty to unlawful possession of a firearm. In another, he was convicted of armed bank robbery. From this evidence—the admission of which Chase does not challenge on appeal—the jury could have understood even without the tattoo evidence that Chase was willing to live by the gun, even if that meant serving a

lengthy prison sentence as a result.[6] For these reasons, the district court's admission of the tattoo photo does not undermine our confidence in the verdict. *See State v. Lafferty*, 2001 UT 19, ¶ 35, 20 P.3d 342 ("An error is harmful if it undermines our confidence in the verdict . . . .").

¶42    We therefore determine that, to the extent the district court abused its discretion in admitting the photo of the tattoos, the error was harmless.[7]

## II. Ineffective-Assistance Claims

¶43    Finally, Chase asserts that Counsel was ineffective in (1) failing to object to the State's reference to his drug use during closing argument and (2) failing to request a jury instruction on self-defense. A defendant asserting ineffective assistance of counsel "must meet the two-prong *Strickland* test: (1) counsel's performance was objectively deficient and (2) the deficient performance resulted in prejudice." *State v. Fleming*, 2019 UT App 181, ¶ 9, 454 P.3d 862 (citing *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)). And we need not address both *Strickland* prongs where we can dispose of the claim on one of the prongs. *Id.*

---

6. In fact, Chase acknowledged at trial that he was convicted of the gun-related offenses and spent more than six years in federal prison for one of them.

7. Although he makes a passing reference to *State v. Hood*, 2018 UT App 236, 438 P.3d 54, Chase specifically disavows any notion that he is "making a rule 404 character or propensity evidence argument." The *Hood* court conducted a rule 403 balancing test in the broader context of assessing whether the district court had properly admitted other-acts evidence under rule 404. *Id.* ¶¶ 34, 44–52. Here, the district court was not assessing the photo's admissibility under rule 404. Therefore, *Hood* does not help Chase's argument.

¶44    To establish deficient performance, Chase must show that Counsel's representation was not "within the wide range of reasonable professional assistance." *State v. Wilkes*, 2020 UT App 175, ¶ 24, 479 P.3d 1142 (cleaned up). This requires us to assess "whether the strategy Counsel employed was that of a reasonable, competent lawyer in the real-time context of a trial." *State v. Arce*, 2024 UT App 43, ¶ 34, 547 P.3d 235 (cleaned up), *cert. denied*, 554 P.3d 924 (Utah 2024). Ultimately, the question we must answer is "whether, considering all the circumstances, [C]ounsel's acts or omissions were objectively unreasonable." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350.

¶45    To establish prejudice, Chase "must show . . . a reasonable probability that, but for Counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Gonzalez*, 2021 UT App 135, ¶ 8, 501 P.3d 1205 (cleaned up). To do so, Chase must demonstrate that those errors affected the proceedings in a way that "undermine[s] our confidence in the outcome." *Arce*, 2024 UT App 43, ¶ 34 (cleaned up).

¶46    We disagree with both of Chase's arguments. His first claim falls short because he hasn't demonstrated that Counsel's failure to object was deficient. His second claim also founders because he has not shown how the lack of a jury instruction on self-defense prejudiced his case.

A.    Failure to Object to the State's Reference to Chase's Drug Use

¶47    During its closing argument, the State contended, "[Chase] is paranoid. He's either going through withdrawals from not doing drugs or he is under the influence of the drugs he smoked that day at the shop that he went to." Chase argues that Counsel rendered ineffective assistance by failing to object to this statement. We disagree.

¶48 The jury heard evidence that Chase was paranoid on the day of the shootings. And he put his drug use on that day at issue when he testified that (1) he had not used drugs on the day of—or the days preceding—the shootings; (2) he had frequently been using illegal drugs until a little over a week before the shootings; and (3) he and Garrett had been at the auto shop, a place where people frequently used drugs, just before the shootings. And while the State effectively agreed that it would not refer to Chase's drug use on that day, it did not agree to do so with respect to his drug-related withdrawal.

¶49 Against this backdrop, Counsel could reasonably have forgone objecting to the State's comment. Specifically, given Chase's testimony on his drug use and his insistence that he did not use drugs on the day of the shootings, Counsel would have been reasonable in concluding that Chase's testimony provided the State with the necessary latitude to discuss Chase's potential drug use on that day. *See State v. Reid*, 2018 UT App 146, ¶ 49, 427 P.3d 1261 ("In closing argument, attorneys have considerable latitude concerning the issues they raise and have the right to fully discuss from their perspectives the evidence and all inferences and deductions it supports. And the law recognizes the prerogative of opposing counsel to swallow their tongue instead of making an objection that might have the risk of highlighting problematic evidence or even just annoying the jury. When we review ineffective-assistance-of-counsel claims in this context, the question is not whether the prosecutor's comments were proper, but whether they were so improper that counsel's *only defensible choice* was to interrupt those comments with an objection." (emphasis added) (cleaned up)).

¶50 At the very least, we cannot say that objection would have been Counsel's "only defensible choice" in this situation. The jury could have readily disbelieved Chase's testimony and inferred that he had in fact been using drugs on the day of the shootings. Counsel could therefore have reasonably concluded that objection

risked highlighting the drug evidence and its problematic inferences. Based on his briefing, Chase would likely argue that he "was not prepared to call a witness to lay foundation for" his negative drug test at trial because the State represented that it would not refer to his drug use on the day of the shootings. The problem is that Chase brought the issue into play with his own testimony.

¶51 Under these circumstances, Chase has not established that Counsel rendered deficient performance in failing to object to the State's comment about his drug use. Therefore, Chase's first ineffective-assistance claim falls short.

B. Failure to Request a Jury Instruction on Self-Defense

¶52 Chase argues next that Counsel was ineffective in failing to request a jury instruction on self-defense. We need not address whether Counsel's failure to request the instruction constituted deficient performance because Chase has not demonstrated a reasonable probability that the outcome would have been different had the jury been instructed on self-defense.

¶53 For one thing, the jury heard the 911 call in which Chase told the dispatcher that somebody "started shooting at" him. During this call, he said nothing to suggest that the gun had been inadvertently discharged during a struggle.

¶54 And, despite Chase's argument to the contrary, there was overwhelming evidence that he intentionally fired the shots that killed Zoey and wounded Garrett and Brenda. The contact wound to the right side of Zoey's head and the resulting blood spatter indicated that the gun was intentionally fired from the right side of the car, where Chase was sitting. *See State v. Todd*, 2007 UT App 349, ¶ 38, 173 P.3d 170 (rejecting as "implausible" the defendant's argument on appeal that, during a struggle, the gun had "accidentally" been pressed against the victim's head before it was fired); *State v. Reece*, 2015 UT 45, ¶ 42, 349 P.3d 712 (explaining

that "evidence of an intentional murder overwhelmed . . . testimony that [the defendant] accidentally shot the victim during a brief struggle," when, among other things, "all of the victim's blood was concentrated in one area right on the love seat where they found her body . . . and the bullet that killed her was fired at a downward trajectory about one foot away from her head" (cleaned up)). Garrett was also sitting in the back seat and had been shot from close range (as evidenced by the stippling on his hand) in the back of his right shoulder. It is difficult to see how he could have shot himself in that location, even during a supposed struggle between him and Chase over the gun. Finally, Chase was the only passenger in the back seat who was not wounded, and the jury heard evidence that he tried to cover up his crimes by getting rid of the gun and removing his blood-stained shirts.

¶55 Under these circumstances, we do not perceive any reasonable probability that a different result would have occurred if the jury had been instructed on self-defense, and Counsel's failure to request such an instruction does not undermine our confidence in the verdict. Therefore, Chase's second ineffective-assistance claim falls short for lack of prejudice.

CONCLUSION

¶56 Chase has not demonstrated that the trial court abused its discretion in admitting the photos from Zoey's autopsy. And even when we assume that the district court abused its discretion in admitting the photo of his tattoos, Chase has not established that the error was harmful. His first ineffective-assistance claim founders because, under the circumstances, Counsel's failure to object to the State's reference to his drug use was not unreasonable. Chase's second ineffective-assistance claim falls short because he has not demonstrated that Counsel's failure to request a self-defense instruction prejudiced his defense. We therefore affirm Chase's convictions.

―――――――――